<u>Larry Cooper v. Melissa Rodriguez, et al.</u>, No. 87, September Term, 2014

**GROSS NEGLIGENCE – IMMUNITY – MARYLAND TORT CLAIMS ACT, MD. CODE ANN., STATE GOV'T (1984, 2014 REPL. VOL.) § 12-101 TO 12-110 – COMMON LAW PUBLIC OFFICIAL IMMUNITY – SPECIAL RELATIONSHIP EXCEPTION – GROSS NEGLIGENCE EXCEPTION –** Court of Appeals held that: (1) trial court erred in striking jury's finding of gross negligence by correctional officer and in concluding that correctional officer was entitled to immunity under Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't (1984, 2014 Repl. Vol.) ("SG") § 12-101 to 12-110; and (2) correctional officer was not entitled to common law public immunity, not because correctional officer owed duty arising out of special relationship with inmates in his custody, but instead because entitlement to common law public official immunity is limited by gross negligence; *i.e.*, gross negligence is exception to common law public official immunity. Correctional officer, having acted with gross negligence, was not entitled to immunity under MTCA or common law public official immunity.

Circuit Court for Baltimore City
Case No. 24-C-06-004331

Argued: June 3, 2015

IN THE COURT OF APPEALS

OF MARYLAND

No. 87

September Term, 2014

_____

LARRY COOPER

v.

MELISSA RODRIGUEZ, ET AL.

_____

Barbera, C.J.
*Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Watts, J.

_____

Filed:  July 24, 2015

*Harrell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Gross negligence has been defined as, among things, "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." Barbre v. Pope, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (citations omitted). This case concerns the brutal murder of an inmate by another inmate during a ride on a prison transport bus that was staffed by five correctional officers. At core, the issue is whether the correctional officer who was in charge of the bus was grossly negligent and, if so, whether he is entitled to common law public official immunity.

We hold that: (I) the trial court erred in striking the jury's finding of gross negligence by the correctional officer and in concluding that the correctional officer was entitled to immunity under the Maryland Tort Claims Act ("the MTCA"), Md. Code Ann., State Gov't (1984, 2014 Repl. Vol.) ("SG") § 12-101 to 12-110; and (II) the correctional officer was not entitled to common law public official immunity, not because the correctional officer owed a duty arising out of a special relationship with the inmates in his custody, but instead because entitlement to common law public official immunity is limited by gross negligence; i.e., gross negligence is an exception to common law public official immunity. Thus, here, having acted with gross negligence, the correctional officer is not entitled to immunity under the MTCA or common law public official immunity.

**BACKGROUND**

In the early morning hours of February 2, 2005, inmate Kevin G. Johns, Jr. ("Johns") murdered fellow inmate Philip E. Parker, Jr. ("Parker"), in plain sight of other inmates and

correctional officers, while the two were traveling together on a prison transport bus with thirty-four other inmates and five correctional officers.

**The Lawsuit**

On May 15, 2006, in the Circuit Court for Baltimore City ("the circuit court"), Melissa Rodriguez and Philip E. Parker, Sr., Parker's parents (together, "Respondents") sued: the State of Maryland; the Secretary of the Maryland Department of Public Safety and Correctional Services ("DPSCS"); the Commissioner of the Division of Correction; the Warden of the Maryland Correctional Adjustment Center ("Supermax");[1] and the five individual correctional officers who staffed the prison transport bus on February 2, 2005— Larry Cooper ("Cooper"), Petitioner, Robert Scott ("Scott"), Kenyatta Surgeon ("Surgeon"), Earl Generette ("Generette"), and Charles Gaither ("Gaither"). The complaint contained six counts: (1) a claim under 42 U.S.C. § 1983 for violating Parker's rights under the Eighth and Fourteenth Amendments to the United States Constitution; (2) a claim for violating Parker's rights under Articles 24 and 26 of the Maryland Declaration of Rights; (3) wrongful death; (4) survival action; (5) assault and battery against the five individual correctional officers concerning their actions after the prison transport bus

---

[1]Supermax was a maximum security State correctional facility located in Baltimore, Maryland that housed the State's most violent inmates. In February 2011, the facility was turned over to the United States Marshals Service to hold federal detainees awaiting trial in the United States District Court in Baltimore. See Peter Hermann, "Crime Scenes: New mission for Supermax, new name," Baltimore Sun, Feb. 8, 2011, available at articles.baltimoresun.com/2011-02-08/news/bs-md-hermann-supermax-closed-20110208_1_supermax-pink-room-north-branch-correctional-institution.

arrived back at Supermax; and (6) funeral expenses.[2]

On October 11-14, 17-21, and 24, 2011, the circuit court conducted a jury trial.  At trial, evidence of the following facts was adduced.

### Initial Transport and Johns's Sentencing

Before murdering Parker, Johns had been convicted of murdering his uncle;[3] sentenced to life imprisonment, with all but thirty-five years suspended; and sent to the Maryland Correctional Institution in Hagerstown, Maryland ("Hagerstown Correctional Institution").  Later, while incarcerated at Hagerstown Correctional Institution, Johns murdered a cellmate,[4] and was transferred from Hagerstown Correctional Institution to Supermax.  On February 1, 2005, four inmates who were incarcerated at Supermax— including Parker, Johns, Bradford Diggs ("Diggs"), and James Folk ("Folk")—were transported by bus to the Circuit Court for Washington County to participate in the hearing on Johns's sentencing.  Parker, Diggs, and Folk testified on Johns's behalf.  At the sentencing hearing, Parker testified that Johns was "paranoid[,]" had "a really, really short temper," and became "very easily irritated and agitated[.]"  The Circuit Court for Washington County sentenced Johns to life imprisonment, without the possibility of

---

[2]The defendants removed this case to the United States District Court for the District of Maryland ("the federal court").  The defendants moved to dismiss or, alternatively, for summary judgment.  The federal court granted the motion for summary judgment as to the federal law claims, and remanded the state law claims to the circuit court.  Respondents appealed, and the United States Court of Appeals for the Fourth Circuit affirmed.  See Parker v. Maryland, 413 F. App'x 634, 641 (4th Cir. 2011).

[3]In the complaint, Respondents alleged that Johns murdered his uncle by "strangling and attempting to decapitate" the man.

[4]In the complaint, Respondents alleged that Johns had "strangled and murdered his sixteen[-]year[-]old cellmate[.]"

parole.

Two guards from Hagerstown Correctional Institution, Bradley Hott ("Hott") and Hunter Vest ("Vest"), submitted reports in connection with an internal investigation conducted after Parker was murdered, detailing Johns's conduct before, during, and after the sentencing hearing. Hott and Vest had transported the four Supermax inmates between Hagerstown Correctional Institution and the Circuit Court for Washington County for Johns's sentencing hearing. According to Hott, after being sentenced, Johns "began to laugh[,]" and later commented that "the killing had just begun." According to Vest, upon being sentenced, Johns said: "'Gonna be trouble when I get back to Baltimore. They think it[']s bad now, the killing has just begun. I'll be back in court for these charges the rest of my life. They will have to put me to death to end this.'" Prior to Parker's murder, neither Hott nor Vest reported Johns's comments to their supervisor because both believed that such comments were not "uncommon for an inmate in [Johns's] situation." Nor were Johns's comments reported to the transportation team from Baltimore when it arrived to transport the Supermax inmates back to Baltimore.

**The Bus and Transport back to Supermax**

After Johns's sentencing, Johns, Parker, Folk, and Diggs were transported to the Hagerstown Correctional Institution to await transport to Supermax on the Maryland Reception, Diagnostic and Classification Center ("MRDCC")'s Central Transportation Unit Bus #2809 ("the bus"). The bus was a "relatively new" Bluebird bus, modified to be a "mobile prison" for the transport of prisoners. The bus consisted of three locked compartments that were separated by steel grillwork and Plexiglas. Three secured

passenger sections were in the middle of the bus. In the front and rear of the bus, there were two securable officer compartments. At the front of the bus, there were three seats—one for the driver, an adjacent front passenger seat, and one seat behind the driver's seat. Behind those three seats were two protective custody cages, one directly behind the driver and one directly across the aisle from the driver's side cage behind the front passenger seat. At the rear of the bus, directly behind the last secured passenger section, there was an elevated cage containing two seats for officers, to permit a good view of the interior of the bus. The elevated cage was separated from the passenger section by Plexiglas and wire mesh caging, which was porous to permit sight and sound. The two officer compartments were separated from the passenger compartment by padlocked doors; the locks on the compartments were designed so that officers in the rear elevated cage could enter the passenger compartment during an emergency.

The bus was staffed by five correctional officers. Cooper was the Officer in Charge. Gaither was the driver. Surgeon and Generette sat in the front of the bus. Scott and Cooper sat in the rear elevated cage, approximately seven and one-quarter feet from Parker, who was sitting next to the window in the second-to-last bench in front of the elevated cage. As the Officer in Charge, Cooper was required to sit at the front of the bus and was disallowed from being the bus driver; Cooper later stated that he "never knew" that, as the Officer in Charge, he was required to ride in the front of the bus. Under a Division of Correction policy concerning "Post Orders: Escort and Transportation Procedures"—applicable to MRDCC, the post to which the five correctional officers were assigned—the correctional officers were to be "alert and observant at all times" and to "display initiative[ and] good

judgment[.]" And, under a Division of Correction policy concerning "Escort and Transportation of DOC Inmates," applicable to MRDCC, the correctional officers were to report any unusual occurrences to the Officer in Charge.

On the morning of February 2, 2005, Johns, Parker, and thirty-four other inmates, boarded the bus. Although DPSCS policy required that there be "[a]t least two armed escort officers [] assigned to transport each" Supermax inmate, and although there were four Supermax inmates on the bus, only five correctional officers staffed the bus. Before boarding the bus, the inmates were strip searched and secured in three-point restraints, which consisted of handcuffs, leg irons, and a waist restraint chain, secured by a metal box and a padlock; the waist chain was to be wrapped snugly around an inmate's torso and secured by the metal box and padlock, resulting in the inmate's hands and forearms being unable to be moved from the inmate's upper abdomen and lower chest. One of Surgeon's responsibilities was to apply the three-point restraints on Johns. It was later discovered that Surgeon improperly placed the three-point restraint device on Johns, such that it was loose; Johns's waist chain was loose and hanging down, permitting Johns to move his hands and forearms away from his upper abdomen and lower chest. As the Officer in Charge, Cooper was responsible for ensuring the three-point restraints were properly secured;[5] Cooper, however, was not aware that he was supposed to check the restraints, and he failed to do so.

---

[5]Respondents' expert in the care, transportation and handling of inmates opined, with a reasonable degree of professional certainty, that Cooper, as the Officer in Charge, "should have double-checked all of the inmates' restraints as they were boarding the bus and prior to [the inmates] getting on the bus."

Once on the bus, the four Supermax inmates seated themselves on two benches at the rear of the bus, directly in front of the elevated officers' cage. Johns and Folk sat on the last bench directly in front of the elevated officers' cage, and Parker and Diggs sat directly in front of Johns and Folk. Both Johns and Parker were in window seats; thus, Johns sat directly behind Parker. This seating arrangement violated DPSCS policy, under which Supermax inmates were to ride in the protective custody cages located at the front of the bus, or, absent space in a protective custody cage, Supermax inmates were to be placed in the front of the bus. The two protective custody cages at the front of the bus were otherwise occupied—one by an immigration detainee who was required to ride separately from the State prisoners, and the other by an inmate who had requested to be segregated from the four Supermax inmates because he was afraid of them. In a deposition excerpt read to the jury, when asked about the seating arrangements on the bus, Cooper testified that he "did the best [he] could with what [he] had."

**Parker's Murder**

At approximately 2:48 a.m., the bus departed for Supermax. At some point during the trip, Johns got up from his seat, reached over the seat in front of him, hooked his arm around Parker's head from behind, pulled Parker's head over the back of the seat, and began choking Parker with his arm. Eventually, Johns released Parker, thinking that Parker was dead. At some point, Diggs, who was sitting next to Parker, got up from his seat and moved to a vacant seat across the aisle, leaving the space next to Parker empty. Although it was a violation of policy for inmates to get up and move around the bus, none of five correctional officers took any action. After the initial choking, Parker started to move and

- 7 -

snore or breathe heavily. Johns got up, moved into the seat next to Parker (which had been vacated by Diggs), and began choking Parker again. During the attack, Johns pulled down on Parker's head while Parker tried to push up, and Johns held Parker's head while turning his body toward the aisle of the bus, "trying to snap [Parker's] neck off." Johns said, among other things, "this is what I do best." Johns cut Parker's neck with a razor blade that had been smuggled onto the bus, and Parker yelled loudly. After the second round of choking, Johns stuffed Parker's limp body between the two seats. There was blood on top of the back of the seat and Johns was covered in a large amount of blood. This brutal two-part attack occurred approximately seven and one-quarter feet from where Cooper was seated in the rear elevated cage, yet Cooper —who was required to be "alert and observant at all times"—claimed not to have witnessed the occurrence.

**Accounts of Parker's Murder**

Patrick Cook ("Cook"), an inmate who was sitting in the last seat on the left-hand side of the bus directly in front of Scott and Cooper, testified at a motions hearing in the criminal case against Johns for Parker's murder that he could see the attack. Excerpts of the transcript of Cook's testimony, admitted into evidence at trial, provided the following description of the murder:

[PROSECUTOR:] How could you see what happened if it was dark?

[COOK:] Because I could see by the, you know, it wasn't really cloudy out or anything. It was just, you know, if I remember correctly, the skies were fairly clear and it was starry. And at certain overpasses there's, you know, lights that shine in the bus windows.

[PROSECUTOR:] Okay. Can you explain to me what you observed [Johns] do and where those acts occurred?

[COOK:] As we were coming down Route 70, right as we got past where Route 40 splits off of Route 70 coming in Marriottsville -- where Marriottsville Road is, [Johns] and [Parker] were -- they were talking all the way down the road.

When we got to where Marriottsville Road is, there's a bridge right between where Route 40 splits off and Marriottsville Road is and there's a slight bend there.

[Johns] stood up and used his arm to hook [Parker] and pull his head back over the seat in front of him and kept pressure on him the whole time, and choking him out.

He held him until we got roughly to where Route 29 is, when [Parker] stopped moving around. Once we crossed over the bridge at the Patapsco River, [Johns] got up out of the seat that was in front of me and moved up into the same with [Parker] and grabbed ahold of him again, because [Parker] started to move.

And, again, clutched him with his arm and choked him out. By the time we reached the Baltimore Beltway, [Parker] wasn't moving anymore, and when we got down to the park and ride, [Parker] wasn't moving at all.

I saw that when [Johns] got up out of the seat to move up into the seat with [Parker], the man that was sitting in the seat with [Parker] got up and slid back to the seat that's directly across from me, because there was only one inmate in that seat.

As [Johns] was getting up, the boy that was sitting in the seat with [Johns] handed him razor blades. He spit them out of his mouth and handed them to [Johns].

And then, as I said, as [Johns] got up and got in the seat with the victim, he was choking him out, he used the razor blades to cut his neck.

And the whole time all of this was going on, he was saying, this is what I do best. This makes my d[***] hard.

By the time we come around out of the park and ride on to the exit to go on to Cooks Lane, the [Division of Correction] officers flipped the lights on in the bus to see what was going on.

- 9 -

At that time [Johns] had [Parker] pushed down in between the seats where he couldn't be seen and he -- the boy that was sitting directly in front of me slid to the middle of the seat to block the view of the [] officers in the back of the bus.

In an interview with law enforcement officers one week after the murder, Johns confessed to the murder; his confession corroborated Cook's account of the murder and excerpts of the interview were admitted into evidence. According to Johns, he choked Parker with his arm, but let Parker go because he thought Parker was dead. Johns acknowledged that when he started choking Parker, Parker tried to yell for help, but "[i]t was pointless." Johns heard Parker snoring or breathing heavily, and he "went around[,]" and cut Parker's neck with a razor. At that point, Parker "yelled real loud[.]" Johns held Parker's head in his arm and was holding Parker while turning his body toward the aisle, "trying to snap [Parker's] neck off." According to Johns, during the attack, Parker tried to wiggle around and "push up" while he was "pulling down[.]" Johns stated that he knew Parker "was trying to push his head up, which was stupid now that [he] th[ought] about it."

In an expert witness report, Dr. John E. Adams described the method in which Johns accomplished Parker's murder:

> The strangulation was accomplished with a 'choke hold,' by placing the left arm around [] Parker's neck from behind and compressing the larynx and/or trachea. The pressure could be increased by pulling the left arm to the rear with the right hand grasping the left wrist. . . .
>
> If the choke hold is released prematurely, allowing the victim to resume breathing, he may regain partial consciousness before the heart succumbs to a lack of oxygen and cardiac arrhythmia or arrest occurs. Apparently, this happened, because it was reported that when [] Parker was released, he began to make snoring noises, the result of breathing through a damaged airway. This prompted [Johns] to change his position and reapply pressure on the neck in an unknown manner.

**The Correctional Officers' Accounts**

In contrast to Cook's testimony, all five correctional officers—including Cooper, who was approximately seven feet from where the attack occurred—alleged that they did not see Johns's attack on Parker.

Scott, who was sitting in the rear elevated cage next to Cooper, testified as follows. Scott saw Johns move to the seat in front of him. Scott knew that inmates were not allowed to change seats, but did not think that he could do anything about it. Scott saw Johns lean towards the window, but could not see what Johns was doing. Scott used the bus telephone to contact Generette, who was at the front of the bus. Scott, Cooper, and Generette shone their flashlights, but Scott still could not see what Johns was doing. Although he could not see anything, Scott told Generette that the officers should "go into the back [of the bus] as a team" when they arrived at Supermax "[b]ecause [he] didn't know if the inmates back there were planning something or if they were already doing something in the back." At a deposition, excerpts of which were read to the jury, Scott testified that he could not "remember what [Cooper] was doing" prior to Johns standing up, but stated that Cooper "might have been eating" or "could have been" sleeping.

Generette testified as follows. Generette was sitting in the front of the bus. Generette received a call from Scott on the bus telephone telling him that Johns had gotten up and moved around. Generette had Gaither turn on the bus's lights. Generette saw Johns sitting and looking up at the ceiling. According to Generette, once the officers "found out that something might have happened [they] speeded up the process." Indeed, Generette acknowledged later telling the internal investigator that "we just put the pedal to the metal

and we tried to get to [Supermax] as fast as we could."

Gaither, the driver, testified that during the drive back to Supermax, he received a message from Generette to turn the bus's lights on because "Scott said he saw something going on in the back of the" bus. Gaither turned the lights on, but Generette said that he could not see anything, and Gaither turned the lights back off. Gaither then "picked the pace up a little bit" and continued driving to Supermax.

Cooper, who was seated next to Scott in the rear elevated cage and who was the Officer in Charge during that trip, testified that he did not see anything unusual and was unable to explain why he did not see anything. On direct examination, the following exchange occurred:

> [THE STATE'S COUNSEL:] Now at that time, early February of 2005, was it the practice to drive to Baltimore with interior lights on or off?
>
> [COOPER:] No, it was never the practice to drive back with -- with the lights on. It was always off unless you had reason to turn them on they stayed off.
>
> [THE STATE'S COUNSEL:] With the lights off were you able to see into the rear compartment?
>
> [COOPER:] You could not see clearly, but you could just see images of people. You couldn't see exactly who it was or, you know, pretty much what was going on.
>
> * * *
>
> [THE STATE'S COUNSEL:] . . . [I]n looking into the rear compartment of the bus, were you able to see silhou[e]ttes of persons?
>
> [COOPER:] Yes.
>
> [THE STATE'S COUNSEL:] Were you able to see person's movements?
>
> [COOPER:] It's -- sometimes. It depends on actually where you were on

- 12 -

Route 70 coming back down because it's -- there's no lights on the highway there and it's -- when it's pitch black it's dark.

[THE STATE'S COUNSEL:] Did you have flashlights?

[COOPER:] Yes, we did carry flashlights.

On cross-examination, Cooper was questioned about his observations on the bus ride, and the following colloquy occurred:

[RESPONDENTS' COUNSEL:] . . . Were you aware that the officers on the bus, including yourself were to remain alert and observant at all times and report any unusual occurrences to the O[fficer in Charge]?

[COOPER:] Yes.

[RESPONDENTS' COUNSEL:] And Officer Scott reported to you that something had happened; did he not?

[COOPER:] He reported that he saw something.

[RESPONDENTS' COUNSEL:] Unusual?

[COOPER:] Yes.

[RESPONDENTS' COUNSEL:] Did you ask him what he saw?

[COOPER:] I believe I did. Whatever was in my report.

[RESPONDENTS' COUNSEL:] What did he tell you that he saw?

[COOPER:] I don't remember at this time.

[RESPONDENTS' COUNSEL:] What did you do as a result of him telling you that he saw something?

[COOPER:] I think we turned -- whatever he told me I think we turned the lights on and checked.

[RESPONDENTS' COUNSEL:] And at that point you now know the person to be [] Johns had his head over the seat?

[COOPER:] I'm not understanding what you're asking me.

[RESPONDENTS' COUNSEL:] When you turned the lights on, I believe you also indicated you shined your flashlight?

[COOPER:] Yes.

[RESPONDENTS' COUNSEL:] And you shined it on the top of the seat?

[COOPER:] I shined it inside the back of the bus. I don't -- I don't -- I can't say whether it was on top of the seat or --

[RESPONDENTS' COUNSEL:] Did you see [] Johns, now you know to be [] Johns with his head over the seat?

[COOPER:] Yes, looking up.

[RESPONDENTS' COUNSEL:] Looking at the ceiling?

[COOPER:] Yes.

[RESPONDENTS' COUNSEL:] So that you would have had your flashlight where you could see his head; was that correct?

[COOPER:] I saw one -- I saw a person with their head back up in the air, yes.

[RESPONDENTS' COUNSEL:] Leaning on the seat?

[COOPER:] Yes.

[RESPONDENTS' COUNSEL:] And did you see any blood on the top of the seat, sir?

[COOPER:] No.

[RESPONDENTS' COUNSEL:] Let me ask you this, can you tell me, how far were you from the nearest inmate to you when you were seated in the cage? This close?

[COOPER:] There was some inmates sitting in a seat that was to the right of me or right in front of me to the right, I know that. And there was inmates --

- 14 -

[RESPONDENTS' COUNSEL:] How far were they?

[COOPER:] They could have -- those inmates could have been -- I'm really not sure. I'm guessing.

[RESPONDENTS' COUNSEL:] If I told you the first seat or the second seat was some five feet away from you, would you disagree?

[COOPER:] I couldn't disagree because I don't know.

[RESPONDENTS' COUNSEL:] Okay. And if I told you that [] Parker was seated seven feet away from you, would you disagree with that?

[COOPER:] I couldn't disagree with that because I don't know.

[RESPONDENTS' COUNSEL:] What was Officer Scott doing on the trip while you were eating your dinner?

[COOPER:] He wasn't doing anything that I could recollect.

* * *

[RESPONDENTS' COUNSEL]: Did you have direct observation, as you understand it, on all four [Supermax] inmates for the entire trip on February 1st and 2nd, return from Hagerstown?

[COOPER:] Did I have direct observation as I see it?

[RESPONDENTS' COUNSEL:] As you understand the words to mean.

[COOPER:] As I understood it, yes.

[RESPONDENTS' COUNSEL:] So you were directly watching the whole time?

[COOPER:] I was watching inside the back of the bus. Whether I was looking at, you know, who I was looking at was not, you know -- I don't know.

[RESPONDENTS' COUNSEL:] Did you see any of the inmates get up?

[COOPER:] No, I did not.

- 15 -

[RESPONDENTS' COUNSEL:] Did you see any inmates change their seat?

[COOPER:] No, I did not.

[RESPONDENTS' COUNSEL:] Do you now know that inmates got up during the trip?

[COOPER:] Yes.

[RESPONDENTS' COUNSEL:] Can you explain to the ladies and gentlemen of the jury how you didn't see that?

[COOPER:] You want me to explain how I didn't?

[RESPONDENTS' COUNSEL:] Yes, sir.

[COOPER:] I didn't see it.

[RESPONDENTS' COUNSEL:] Was it dark?

[COOPER:] Yes.

* * *

[RESPONDENTS' COUNSEL:] As you returned from Hagerstown, if you couldn't see all the inmates, did you think you could see better with the lights on in the trip back from Hagerstown, sir?

[COOPER:] Possibly.

**Arrival at Supermax**

The bus proceeded to Supermax without stopping or contacting any law enforcement agency for assistance. The bus arrived at Supermax at approximately 4:03 a.m. Once there, Cooper collected and secured the officers' weapons, and Gaither called the inmates off the bus individually by name, beginning with the Supermax inmates. Diggs and Folk were called and exited the bus. When Johns, the third inmate called, got out of his seat, the officers saw a large amount of blood on Johns's shirt and a cut on Johns's arm.

- 16 -

According to Generette, Johns was "covered in blood[,]" with "blood on his shirt, on his arm sleeves." When Parker's name was then called, Parker failed to respond. The officers entered the bus, saw blood on Parker's seat,[6] and found Parker unconscious, wedged between two seats. Because Parker was "too tangled up[,]" the officers were required to remove Parker's restraints to pull him out from under the seat. The officers then brought Parker's body to the front of the bus and laid him down in aisle. Generette testified that Parker had a cut above his eye, a long welt or bruise going down the sides of his neck, and blood coming out of his nostrils. Gaither checked for signs of life, but detected none, at which point Gaither began administering CPR.[7] Parker was eventually transported by ambulance to a hospital, where he was pronounced dead at 4:57 a.m., without having regained consciousness. The cause of death was strangulation.

**Internal Investigation**

As a result of Parker's death, the DPSCS Internal Investigation Unit ("IIU") launched an investigation. The investigation revealed that the officers did not follow appropriate procedures in transporting the inmates on the bus. For example, Cooper, as the Officer in Charge, should have had keys to the rear passenger compartment so that he and Scott could enter in the event of an emergency. Cooper, as the Officer in Charge, should have sat in the front of the bus instead of in the rear elevated cage, and Cooper

---

[6]Photographs admitted into evidence showed that there was blood on top of the seat back where Parker was sitting.

[7]Major Vivian Presbury, the shift commander, checked Parker's vital signs and felt a faint pulse in Parker's carotid artery. And Lieutenant Emmanuel Nzeadighibe checked Parker's neck and wrist for a pulse and believed he felt a pulse that was fading away.

should have notified his superiors of any problems during transport. Several of the bus's interior lights were burned out and a two-way radio was not working. Johns's three-point restraints were not properly secured, and the officers permitted Diggs and Johns to move about on the bus. Cooper knew that the correctional officers had unauthorized personal cell phones on the bus, but did not confiscate the cell phones or report the infractions; such contraband items would have distracted the officers from maintaining direct observation of the inmates on the bus.

The IIU reenacted the attack under three lighting conditions: (1) with all of the interior bus lights turned off; (2) with three overhead interior bus lights turned on, two in the front and one in the rear; and (3) with all of the overhead interior bus lights turned on. In the first scenario, one investigator who sat in the rear elevated officers' cage in the seat in which Scott had sat documented that he was able to see the silhouette of the person who was playing Johns stand up and move to the seat in front of him, and was able to see the person's facial features. Another investigator testified that, in this first scenario, the investigators "could see very well" and that "there was no way you could not see what was going on on the bus." In the second scenario, one investigator documented that he could see "the person's movements, and some facial features." In the third scenario, one investigator documented that he "was able to see very well" and could "see all the way to the front of the bus." According to that investigator, he was able to see the person who was playing Johns reach over the seat and choke the person who was playing Parker, and he also saw the person who was playing Johns stand up, change seats and push the head of the person who was playing Parker down below the seat. One investigator testified that, in

- 18 -

each scenario and sitting in the rear elevated officers' cage, she "could see what was going on." The reenactments revealed that Scott and Cooper were seated seven and one-quarter feet from where Parker was seated at the time of Johns's attack.

As a result of IIU's investigation, Gaither and Generette were officially reprimanded, and Generette was suspended for five days without pay. Surgeon and Scott were both terminated from employment, and their terminations were upheld on appeal. Cooper, like Surgeon and Scott, was to be terminated, but elected to retire instead; accordingly, Cooper did not appeal his notice of termination. Cooper's notice of termination was admitted into evidence at trial.[8] The notice explained the reasons for Cooper's termination as follows:

> During the entire episode, [] Cooper failed to take any actions to investigate or otherwise determine what, if anything, had happened. More importantly, as the Officer-in-Charge, [] Cooper had a duty to take the appropriate steps necessary to prevent [] Johns'[s] murder of [] Parker. . . . The conclusions drawn from the investigative findings were that [] Cooper was grossly negligent in the performance of his duties.

> After reviewing the investigative findings, it was determined that [] Cooper violated several Post Order, Institutional Directives and [DPSCS] policies and procedures. . . . [] Cooper admitted that he was unfamiliar with the directives pertaining to the transportation bus. [One policy] requires correctional officers to be alert and attentive at all times during their tour of duty. . . . [] Cooper failed to observe the attack and murder of [] Parker or any of the inmate movement that occurred in the area.

> . . . More importantly, his failure to take any steps to notify his superiors that there was a problem during the transportation detail contributed to the failure to timely address [] Parker's medical emergency.

> The death of [] Parker was caused by complacency and neglect. The

---

[8]Surgeon's and Scott's notices of termination, as well as Gaither's and Generette's notices of disciplinary action, were also admitted into evidence at trial.

- 19 -

large amount of blood discovered on the seat and on [] Johns'[s] clothing was an obvious indication that a struggle occurred. . . .

Moreover, if [] Scott and Cooper, located in the rear of the bus, had been alert and attentive to their assignment, the severity of this incident could have been prevented. . . .

[] Cooper's performance lapses breached the safety and security of [] Parker and contributed to his death. Such wantonly careless conduct and intentional misconduct seriously undermined the safety and security of staff and inmates during the transportation detail. His failure to appropriately perform his duties and his false and misleading accounts of the events of February 2, 2005 undermine his credibility and make him unsuitable for continued employment as a correctional officer.

**The Jury's Verdicts and Post-Trial Motions**

The jury returned verdicts in Generette's favor, finding that he had not been negligent, and in Respondents' favor against Cooper, Scott, Surgeon, Gaither, and the State. The jury found Scott, Surgeon, and Gaither were negligent; that Cooper was grossly negligent; and that Scott's, Surgeon's, and Gaither's negligence, and Cooper's gross negligence, were the proximate causes of Parker's death. The jury awarded $10,000,000 in non-economic damages to Parker's estate, $1,000,000 in non-economic damages to Parker's father, $7,500,000 in non-economic damages to Parker's mother, and $15,000 in funeral expenses.

Cooper, Gaither, Scott, and Surgeon filed a motion, seeking judgment notwithstanding the verdict as to the jury's finding that Cooper had been grossly negligent, and judgment notwithstanding the verdict as to the liability of the individual correctional officers. The circuit court granted the motion for judgment notwithstanding the verdict as to the correctional officers by: (1) striking the jury's finding of gross negligence as to

- 20 -

Cooper and ordering that a finding of negligence be entered; and (2) determining that the correctional officers were immune from liability "under both Public Official Immunity and the" MTCA.[9]

**Appeals to the Court of Special Appeals**

Respondents and the State appealed, and the Court of Special Appeals affirmed in part and vacated in part the judgments of the circuit court. See Rodriguez v. State, 218 Md. App. 573, 98 A.3d 376 (2014). Specifically, the Court of Special Appeals held that the circuit court erred in striking the jury's finding of Cooper's gross negligence and in concluding that Cooper was immune from liability, stating:

> With respect to the claims against [] Cooper, we conclude that, because there was sufficient evidence of gross negligence on the part of [] Cooper to have supported the jury's finding on that issue, the [circuit] court erred in striking that part of the jury's verdict. We further conclude that the [circuit] court erred in ruling that there was no special relationship between [] Cooper and the inmates. Consequently, the [circuit] court also erred in concluding that [] Cooper was immune from liability and entering judgment notwithstanding the verdict in favor of [] Cooper. Because [] Cooper's tortious conduct was gross negligence, he was not entitled to immunity under the MTCA; and, because [] Cooper owed a duty arising out [of] a special relationship with the inmates in his custody, he was not entitled to common law public official immunity.

Rodriguez, 218 Md. App. at 580-81, 98 A.3d at 380.[10]

---

[9]The circuit court also struck the damages awards entered against the individual correctional officers; ruled that there were three claimants under the Maryland Tort Claims Act—Parker's estate, Parker's mother, and Parker's father—and granted remittiturs of the jury's awards of compensatory damages to $200,000 to each of the claimants; and entered judgment against the State in the amount of $200,000 in favor of each claimant, for a total award of $600,000.

[10]The Court of Special Appeals also held that Respondents "are entitled to collect no more than $200,000 from the State pursuant to the MTCA[,]" and that the MTCA's

Cooper filed a petition for a writ of *certiorari*, which this Court granted.  See Cooper

v. Rodriguez, 441 Md. 61, 105 A.3d 489 (2014).[11]

**DISCUSSION**

**I. Gross Negligence and Immunity under the MTCA**

Cooper contends that the circuit court was correct in striking the jury's finding that

his conduct constituted gross negligence.  Essentially, Cooper argues that there was no

evidence that he intentionally failed to perform a duty or that he exhibited a reckless

disregard for Parker's life.  Cooper asserts that he had no reason to believe that Johns posed

a danger to Parker or that he intentionally disregarded danger to Parker.

Respondents counter that there was "overwhelming evidence" to support the jury's

finding that Cooper was grossly negligent.  According to Respondents, the evidence

demonstrated that Cooper was aware of Johns's attack on Parker, yet intentionally failed

to perform his duty, as the Officer in Charge, to protect Parker.  Respondents assert that

whether Cooper had prior notice of Johns's propensity for violence is of no consequence

because, once Johns began to attack and choke Parker only seven feet away from Cooper,

it was grossly negligent for Cooper not to intervene despite having the duty to do so.

"An appellate court reviews the trial court's decision to allow or deny judgment or

[judgment notwithstanding the verdict] to determine whether it was legally correct, while

viewing the evidence and the reasonable inferences to be drawn from it in the light most

---

$200,000 limit on the State's waiver of sovereign immunity is constitutional.  Rodriguez,
218 Md. App. at 581, 98 A.3d at 381.
    [11]Respondents filed a conditional cross-petition for a writ of *certiorari* concerning
the constitutionality of the MTCA's $200,000 limit on damages, which this Court denied.

favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented." Scapa Dryer Fabrics, Inc. v. Saville, 418 Md. 496, 503, 16 A.3d 159, 163 (2011) (citations, brackets, and internal quotation marks omitted). See also Bradford v. Jai Med. Sys. Managed Care Orgs., Inc., 439 Md. 2, 15, 93 A.3d 697, 705 (2014) ("In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, the appellate court considers whether there is any evidence adduced, however slight[,] from which reasonable jurors, applying the appropriate standard of proof, could find in favor of the plaintiff on the claims presented." (Citation, internal quotation marks, and ellipses omitted)). "[I]f the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the [judgment notwithstanding the verdict] should be denied." Barnes v. Greater Balt. Med. Ctr., Inc., 210 Md. App. 457, 480, 63 A.3d 620, 633-34 (2013) (citations omitted).

**The MTCA and CJP § 5-522**

"[G]enerally[,] under common law, the State enjoys sovereign immunity and is thus protected from suit for both ordinary torts and State constitutional torts. The State, however, has partially waived this immunity by statute." Ford v. Balt. City Sheriff's Office, 149 Md. App. 107, 119, 814 A.2d 127, 133 (2002) (Greene, J.) (citations omitted). The MTCA provides, in pertinent part, as follows concerning waiver of immunity:

(a) *In general.* — (1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.
(2) The liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence.

- 23 -

(b) *Exclusions and limitations*. — Immunity is not waived under this section as described under § 5-522(a) of the Courts and Judicial Proceedings Article.

SG § 12-104. SG § 12-105, concerning immunity of State personnel, provides: "State personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article." Md. Code Ann., Cts. & Jud. Proc. (1973, 2013 Repl. Vol.) ("CJP") § 5-522(a) and (b), in turn, provide:

(a) *Tort liability — Exclusions from waiver under § 12-104 of the State Government Article*. — Immunity of the State is not waived under § 12-104 of the State Government Article for:

. . .

(4) Any tortious act or omission of State personnel that:
(i) Is not within the scope of the public duties of the State personnel; or
(ii) Is made with malice or gross negligence[.]

. . .

(b) *In general*. — State personnel, as defined in § 12-101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver.

In Ford, 149 Md. App. at 120, 814 A.2d at 134, writing for the Court of Special Appeals, Judge Greene explained that, when the above statutes are read in concert, they "clearly establish[] that a party can bring a viable tort action against the State when the tort was committed by a State employee acting within the scope of his or her employment and without malice or gross negligence." Consistently, the MTCA "provides that a State employee acting within his or her scope of employment and without malice or gross

- 24 -

negligence is immune from suit." Id. at 120, 814 A.2d at 134. If "the State employee has acted with malice or gross negligence, . . . the State is immune from suit and the injured party may only bring a viable tort claim against the State employee." Id. at 120-21, 814 A.2d at 134.

### Gross Negligence

In Barbre, 402 Md. at 187, 935 A.2d at 717, this Court described gross negligence as follows:

> We have viewed gross negligence . . . as something more than simple negligence, and likely more akin to reckless conduct; gross negligence is
>
> > an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist.

(Citations, emphasis, and internal quotation marks omitted).

"Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case[,]" and "is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached." Romanesk v. Rose, 248 Md. 420, 423, 237 A.2d 12, 14 (1968) (citations omitted). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." Taylor v. Harford Cnty. Dep't of Social Servs., 384 Md. 213, 229, 862 A.2d 1026, 1034 (2004) (citation and internal quotation marks omitted).

In Barbre, 402 Md. at 190, 163, 935 A.2d at 718-19, 702-03, this Court held that an unarmed plaintiff had "presented sufficient facts to demonstrate gross negligence on the part of" the defendant, a deputy sheriff who ordered the unarmed plaintiff to raise his hands, saw the plaintiff comply, approached with his gun drawn, and shot the plaintiff in the neck. Although we held that the trial court had erred in granting summary judgment in the defendant's favor, we observed: "[T]he evidence at trial may show that [the defendant] was acting without malice or gross negligence. If it does, [the defendant] would be entitled to immunity granted by the MTCA. On the other hand, the evidence may show that [the defendant] was acting either maliciously, or grossly negligent, so that he would not be entitled to immunity under the MTCA." Id. at 190, 935 A.2d at 719.

**Analysis**

Here, in complete agreement with the Court of Special Appeals, we conclude that the circuit court erred in striking the jury's finding that Cooper acted with gross negligence. The record is replete with evidence demonstrating that Cooper was grossly negligent. It is an unfortunate reality that prison can be dangerous for both inmates and correctional officers. In this instance, however, the circumstances demonstrate that Parker's murder was accomplished in the face of Cooper's total disregard for his duty as a correctional officer and indifference to the consequences to Parker.

Although any murder is abhorrent, this one was particularly heinous. Cooper, the officer responsible for protecting Parker and all of the inmates on the bus, sat several feet away while Parker was systematically choked to death and had his throat cut; and Cooper took no action whatsoever. The sequence of events is well established in the record. Johns,

- 26 -

who initially sat behind Parker, rose, pulled Parker's head back up over the seat between them, and began choking Parker. Cooper did not respond to this occurrence. After "a minute[,]" believing that he had killed Parker, Johns let him go. Diggs, who was sitting next to Parker, moved to another seat. Cooper did not respond to this event. Parker began making sounds and moving; Johns moved into the seat next to Parker. Cooper did not respond. Johns began choking Parker again, twisting Parker's neck while pulling down and Parker pulled up. Cooper did not respond. Johns cut Parker's throat and Parker yelled out. Cooper took no action.

Cooper was seven and one-quarter feet away in a raised cage that was designed to give him a full view of the bus. Whether Cooper was asleep, or watching and not performing his duty, under the circumstances described above, his failure to perform his duty to protect Parker constituted gross negligence.

Although we are loath to belabor the unfortunate circumstances of Parker's death, the record overflows with facts sufficient to support the finding of gross negligence as to Cooper. Cooper failed to follow basic procedures. Expert testimony established that, as the Officer in Charge, Cooper was responsible for ensuring that the three-point restraints placed on inmates were properly secured. It is undisputed that Surgeon improperly secured the three-point restraint device on Johns, and Cooper did not check the restraints. Next, although according to DPSCS policy, Supermax inmates such as Johns and Parker were to ride in the protective custody cages located at the front of the bus, or, absent space in a protective custody cage, were to ride in the front of the bus, Cooper violated DPSCS policy by allowing Supermax inmates Johns, Folk, Parker, and Diggs to sit on the two benches at

the rear of the bus. According to Cooper, he "did the best [he] could with what [he] had" concerning the seating arrangements on the bus. And, as the Officer in Charge, Cooper was required to sit at the front of the bus instead of in the rear elevated cage.

Evidence adduced at trial leads to the inescapable conclusion that Cooper was in a position to see and hear the murder. Sitting in the rear elevated cage, Cooper was seven and one-quarter feet from where Parker was at the time of Johns's attack, and was facing Johns and Parker when the attack occurred. Cook, an inmate on the bus who was seated in the last seat on the left-hand side of the bus directly in front of Cooper (in other words, in the seat across the aisle from where Johns originally sat), saw and heard Johns's attack on Parker. Johns confessed to the murder and stated that, when he started choking Parker, Parker "tried to yell for help[,]" and that, when he cut Parker's neck with the razor blade, Parker "yelled real loud[.]" Scott, who was sitting next to Cooper in the rear elevated cage, was so concerned that suspicious activity was occurring when he saw Johns get up and move around that Scott used the bus's telephone to contact Generette at the front of the bus.

For his part, Cooper testified that he did not see or hear anything unusual, and that he did not see Johns changing seats. Nonetheless, the officers on the bus were sufficiently concerned that something unusual was occurring that they formulated a plan and sped up. Generette testified that, once the officers "found out something might have happened [they] speeded up the process" and "put the pedal to the metal and [] tried to get to [Supermax] as fast as [they] could." Scott testified that he told Generette that the officers should "go into the back [of the bus] as a team" when they arrived at Supermax "[b]ecause [he] didn't

know if the inmates back there were planning something of if they were already doing something in the back."

IIU's investigation confirmed that an officer in Cooper's location would have been able to see the attack. IIU's reenactments of the events of February 2, 2005, demonstrated that, even with all of the bus's lights turned off, a person seated in the rear elevated cage could see Johns stand up and move to the seat in front of him, and that the person would have been able to see Johns's facial features. Another investigator testified that, under each lighting condition and seated in the rear elevated cage, "there was no way you could not see what was going on on the bus."

When viewed in its totality and in the light most favorable to Respondents, the evidence was sufficient to support the conclusion that Cooper, as the Officer in Charge, failed to fulfill the duty to ensure Parker's safety and acted with reckless disregard for Parker's life. Indeed, the evidence was sufficient to support the conclusion that Cooper, who claimed to have not seen or heard the attack occurring right in front of him, and who testified that he was unaware of several policies meant to ensure inmates' safety, was "so utterly indifferent to the rights of others that he act[ed] as if such rights did not exist." Barbre, 402 Md. at 187, 935 A.2d at 717 (citations omitted).[12] Whether Cooper knew of

---

[12]Cooper's contention that, in light of his testimony, there was no evidence "to support a finding that [he] actually observed, or was otherwise aware of, the attack" is a red herring. There was a virtual avalanche of evidence sufficient to support the inference that Cooper saw and was aware of the attack—Cook's testimony, Johns's confession, and the IIU reenactment—or, in the alternative, that Cooper's failure to observe the attack occurring mere feet in front of him constituted gross negligence because such inattention demonstrated an "utter[] indifferen[c]e" to the rights of others. Barbre, 402 Md. at 187,

Johns's propensity for violence before the transport began is inconsequential where the evidence was sufficient to support the rational inference that, after the bus began its trip to Supermax, Cooper's actions constituted gross negligence.

Because Cooper acted with gross negligence, he is not entitled to immunity under the MTCA. See SG § 12-105 ("State personnel shall have the immunity from liability described under [CJP] § 5-522(b)[.]"); CJP § 5-522(b) ("State personnel . . . are immune from suit . . . and from liability in tort for a tortious act or omission that . . . is made without malice or gross negligence[.]"); Ford, 149 Md. App. at 120, 814 A.2d at 134 (The MTCA "provides that a State employee acting within his or her scope of employment and without malice or gross negligence is immune from suit.").

## II. Common Law Public Official Immunity

Cooper primarily contends that the Court of Special Appeals erred in concluding that the special relationship exception negates public official immunity.

An appellate court reviews without deference a trial court's application of common law public official immunity. See, e.g., Livesay v. Balt. Cnty., 384 Md. 1, 9-10, 862 A.2d 33, 38 (2004).

Common law public official immunity applies to "public officials (as opposed to mere employees)[13] who perform negligent acts during the course of their discretionary (as

---

935 A.2d at 717 (citations omitted). In either event, it was within the jury's province to discredit Cooper's testimony that he did not see the attack.

[13]Prison guards or correctional officers are public officials. See Carder v. Steiner, 225 Md. 271, 275, 170 A.2d 220, 222 (1961), overruled on other grounds by James v. Prince George's Cnty., 288 Md. 315, 323 n.9, 418 A.2d 1173, 1178 n.9 (1980); Livesay, 384 Md. at 13-14, 862 A.2d at 39.

opposed to ministerial) duties." Houghton v. Forrest, 412 Md. 578, 585, 989 A.2d 223, 227 (2010) (citation omitted). As to discretionary duties, we explained: "The term discretion denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, discretion is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience and uncontrolled by the judgment or conscience of others." Livesay, 384 Md. at 16, 862 A.2d at 41 (citation and internal quotation marks omitted).[14]

Here, there can be no reasonable dispute that, at the time of the incident, Cooper was a public official, acting within the scope of his employment, and that he was authorized to use his discretion in the furtherance of his employment. It is undisputed that Cooper did not commit an intentional tort or act with malice. Thus, Cooper is seemingly entitled to common law public official immunity. Before concluding as much, though, we must address two issues related to Cooper's entitlement to common law public official immunity—(1) whether the "special relationship exception" is a limitation on common law public official immunity; and (2) whether gross negligence prevents the application of common law public official immunity. We conclude that the special relationship exception, rather than being a limitation on common law public official immunity, is a limitation on the public duty doctrine; in other words, the existence of a special relationship

---

[14]Common law public official immunity does not apply simply because an individual is a public official who performed a discretionary act. A public official is not entitled to common law public official immunity where the official committed an intentional tort or acted with malice. See Houghton, 412 Md. at 586, 989 A.2d at 228; Livesay, 384 Md. at 12, 862 A.2d at 39.

does not prevent the application of common law public official immunity.  Nonetheless, we hold that the Court of Special Appeals was correct in concluding that Cooper was not entitled to common law public official immunity, not because Cooper owed a duty arising out of a special relationship with the inmates in his custody, but rather because entitlement to common law public official immunity is limited by gross negligence; *i.e.*, gross negligence is an exception to common law public official immunity.  Thus, Cooper, having acted with gross negligence, is not entitled to immunity under common law public official immunity.  We explain.

## A. Special Relationship Exception

Common law public official immunity is distinct from the public duty doctrine. Under the public duty doctrine, where a statute or common law principle imposes upon a public entity a duty to the public as a whole, as opposed to a duty to a particular group of people, "the duty is not [] enforceable in tort."  Muthukumarana v. Montgomery Cnty., 370 Md. 447, 486, 805 A.2d 372, 395 (2002) (citation and internal quotation marks omitted). As such, under the public duty doctrine, law enforcement "officers ordinarily may not be held liable for failure to protect specific persons because they owe no duty, as the first element of a negligence actions requires, to those individuals."  Id. at 486-87, 805 A.2d at 395 (footnote omitted).  See also Pace v. State, 425 Md. 145, 157, 38 A.3d 418, 425 (2012) ("A frequently cited example is that the duty owed by [law enforcement] by virtue of their positions as officers is a duty to protect the public, and is thereby not enforceable in tort by a member of the public claiming that [law enforcement] failed to protect [that person], specifically." (Citations and internal quotation marks omitted)).

The public duty doctrine has certain limitations, including the "special relationship exception." In <u>Muthukumarana</u>, 370 Md. at 487-88, 805 A.2d at 396, this Court explained:

> The public duty doctrine . . . has no application when the court concludes that a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large. . . . [T]his is nothing more than a modified application of the principle that[,] although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, [one] must act in a reasonable manner. Therefore, a proper plaintiff is not without recourse. If [the plaintiff] alleges sufficient facts to show that the defendant [law enforcement officer] created a special relationship with [the plaintiff] upon which [the plaintiff] relied, [the plaintiff] may maintain [an] action in negligence. In order for a special relationship between a police officer and an individual to be found, however, . . . it [must] be shown that the local government or the [law enforcement] officer affirmatively acted to protect the specific victim or specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the [law enforcement] protection.

(Citations, brackets, ellipses, footnote, and internal quotation marks omitted) (emphasis in original).

In <u>Williams v. Mayor & City Council of Balt.</u>, 359 Md. 101, 112-13, 753 A.2d 41, 47 (2000), this Court held that there was a genuine dispute of material fact as to whether a law enforcement officer, a victim of domestic violence, and the victim's mother were in a special relationship. The officer responded to the victim's home; the victim's mother was also present. <u>Id.</u> at 109, 753 A.2d at 45. The officer left the home to retrieve a camera to photograph the victim's injuries. <u>Id.</u> at 110-11, 753 A.2d at 45-46. Before the officer returned, the suspect returned and shot the victim and her mother. <u>Id.</u> at 110, 753 A.2d at 46.

The trial court granted summary judgment in the officer's favor. <u>Id.</u> at 112, 753

A.2d at 47. This Court held that the trial court erred in doing so, stating:

> [V]iewing the deposition of [the victim's mother] in a light favorable to her, [the o]fficer[]'s affirmative actions, directions, and specific promises of protection to [the victim and her mother], if they occurred and were reasonably relied upon by them, may have created a special relationship between himself and [the victim and her mother] that would establish a duty of care on the part of [the o]fficer [] to protect them; therefore, his actions at [the house] might not be protected by either statutory or common law immunity.

Id. at 112-13, 753 A.2d at 47.

We reiterated that "a claim for negligence will only stand if [the o]fficer [] actually owed [the victim and her mother] a legal duty to protect, which he breached." Id. at 142, 753 A.2d at 63. We explained:

> [W]e recognize the general rule, as do most courts, that absent a "special relationship" between [law enforcement] and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against [law enforcement] officers. Rather, the "duty" owed by [law enforcement] by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition.
>
> . . .
>
> [L]iability for failure to protect an individual citizen against injury caused by another citizen, where the officer is performing a discretionary act, does not lie against an officer, absent a "special relationship." In the presence of a "special relationship[,]" liability may lie[,] and immunity may not survive. Thus, the public duty doctrine is not an absolute bar to recovery.

Id. at 143-44, 753 A.2d at 64 (emphasis, brackets, and ellipses omitted). We set forth the "general standard" governing the "special relationship" doctrine, stating that "for a special relationship between [law enforcement] officer and victim to be found, it must be shown that the local government or the [law enforcement] officer affirmatively acted to protect

- 34 -

the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the [law enforcement] protection." Id. at 150, 753 A.2d at 67-68 (citation omitted).

This Court concluded:

[G]enerally, a [law enforcement] officer has immunity from civil liability for negligence when he [or she] is performing a discretionary duty (although not while performing a ministerial act), absent a special relationship; however, we hold that [the o]fficer[]'s affirmative actions and specific promises of protection to [the victim and her mother], if in fact they occurred, are sufficient to have created a special relationship between himself and [the victim and her mother]. This special relationship, if it existed, may have created a duty of protection on the part of [the o]fficer []. If so, his actions at [the house] may not warrant protection under either statutory or common law immunity.

Id. at 151, 753 A.2d at 68.

In Lovelace v. Anderson, 366 Md. 690, 705, 785 A.2d 726, 734 (2001), in discussing the requirements for application of common law public official immunity, we noted that "the defense of public official immunity generally applies only to negligent acts[,]" as opposed to intentional or malicious conduct. In noting that several other limitations to public official immunity existed, we stated:

Another limitation to a [law enforcement] officer's defense of public official immunity occurs when, under the circumstances, a special relationship exists between the officer and the injured person which creates a duty on the part of the officer to protect the victim.

Lovelace, 366 Md. at 706, 785 A.2d at 735. In Lovelace, id. at 714, 785 A.2d at 739, we concluded that the officer was not entitled to public official immunity because he was acting in a private capacity, and not as a public official engaged in acts in furtherance of his official duties.

- 35 -

A careful reading of the relevant case law makes clear that the special relationship exception is a limitation on the public duty doctrine and not a limitation on common law public official immunity. In short, Williams, 359 Md. 101, 753 A.2d 41, does not stand for the proposition that the special relationship exception is a limitation on common law public official immunity. The discussion in Williams of the special relationship exception is set forth in the context of the public duty doctrine, not common law public official immunity. In Williams, id. at 143-44, 753 A.2d at 64, we explained in detail that this Court recognizes the special relationship rule in the context of duties owed by law enforcement officers by virtue of their roles as officers, and then stated that, "[i]n the presence of a 'special relationship[,]' liability may lie[,] and immunity may not survive. Thus, the public duty doctrine is not an absolute bar to recovery." (Citations, brackets, ellipses, and internal quotation marks omitted). In Williams, id. at 140-41, 753 A.2d at 62, when describing common law public official immunity, we stated that a government representative is entitled to public official immunity if and only if three requirements are satisfied;[15] notably, we did not state that a special relationship would bar public official immunity. To the extent that this Court's choice of words implied that we were applying the special relationship exception to common law public official immunity rather than to the duty element of the public duty doctrine, such phrasing was inadvertent.

Similarly, in Lovelace, we did not hold that the special relationship exception

[15]Those three requirements are: "(1) he or she must be a public official; and (2) his or her tortious conduct must have occurred while performing discretionary acts in furtherance of official duties; and (3) the acts must be done without malice." Williams, 359 Md. at 140-41, 753 A.2d at 62 (footnote and emphasis omitted).

applies to common law public official immunity. In <u>Lovelace</u>, 366 Md. at 714, 785 A.2d at 739, this Court held that the off-duty officer was not entitled to common law public official immunity because he was serving in a private capacity and not an official capacity; thus, any discussion of the special relationship exception was *dicta*. Additionally, in <u>Lovelace</u>, <u>id.</u> at 706-07, 785 A.2d at 735, we repeated the same language contained in <u>Williams</u> and did not add to the analysis of the special relationship exception or common law public official immunity. Furthermore, in <u>Lovelace</u>, <u>id.</u> at 706, 785 A.2d at 735, this Court's observation—that the special relationship exception is "[a]nother limitation to a police officer's defense of public official immunity"—did not reflect the holding in <u>Williams</u>. As explained above, in <u>Williams</u>, this Court did not hold that the special relationship exception is a limitation to common law public official immunity. Rather, in <u>Williams</u>, 359 Md. at 144, 753 A.2d at 64, we held that the presence of a special relationship is an exception to immunity under the public duty doctrine. (Citation omitted). In other words, when read together, it is clear that, in <u>Williams</u> and <u>Lovelace</u>, this Court addressed the special relationship exception in the context of the public duty doctrine, not common law public official immunity.

Although neither this Court nor the Court of Special Appeals has expresssly described the distinction between common law public official immunity and the public duty doctrine, we find instructive the Supreme Court of West Virginia's recent discussion on the topic. Specifically, in <u>W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.</u>, 766 S.E.2d 751, 776-77 (W. Va. 2014), the Supreme Court of West Virginia stated:

[T]he special relationship or special duty doctrine is an exception to the

liability defense known as the public duty doctrine; *it is neither an immunity concept, nor a stand-alone basis of liability*. The special duty exception does not create liability but negates the public duty doctrine, a defense to liability. We have made plain that, qualified immunity is, quite simply, immunity from suit. The public duty doctrine is a defense to negligence-based liability, i.e. an absence of duty.

(Citations, paragraph break, brackets, and internal quotation marks omitted) (emphasis in original).

We know of no case involving common law public official immunity in which a Maryland appellate court—except for the decision of the Court of Special Appeals in this case, see Rodriguez, 218 Md. App. at 622-29, 98 A.3d at 405-09—held that the special relationship exception is a limitation on common law public official immunity. Plainly put, the special relationship exception does not apply to a determination of whether a public official is entitled to common law public official immunity. Thus, the Court of Special Appeals erred in concluding that, "[b]ecause a special relationship existed between the inmates and [] Cooper, and because that relationship gave rise to a duty which was clearly breached, the [circuit] court erred in finding that [] Cooper was entitled to the benefit of common law public official immunity." Rodriguez, 218 Md. App. at 629, 98 A.3d at 409 (citation omitted).

### B. Gross Negligence Exception

Whether gross negligence serves as an exception to common law public official immunity is a matter of first impression. On this issue, this Court's most relevant statement is that common law public official immunity applies to "public officials (as opposed to mere employees) who perform **negligent acts** during the course of their discretionary (as

opposed to ministerial) duties." Houghton, 412 Md. at 585, 989 A.2d at 227 (emphasis

added) (citation omitted). The Court of Special Appeals has stated, however, that gross

negligence is an exception to common law public official immunity. For example, in Hines

v. French, 157 Md. App. 536, 560-62, 852 A.2d 1047, 1061-62 (2004), in discussing

whether certain defendants were entitled to "public official immunity[,]" the Court of

Special Appeals stated:

> Under common law immunity, public officials are entitled to qualified
> immunity from negligence claims. . . . [W]hether under common law
> qualified immunity or the statutory qualified immunity provided by the
> MTCA, [the defendants] may [] avoid liability for a claim of negligence
> [only] if their conduct was within the scope of the duties of State personnel[,]
> and each acted without malice or gross negligence.

(Citations and paragraph breaks omitted). Similarly, in Callahan v. Bowers, 131 Md. App.

163, 175-76, 748 A.2d 499, 506, vacated on other grounds, 359 Md. 395, 754 A.2d 388

(2000) (per curiam), in determining that a law enforcement officer was entitled to public

official immunity, the Court of Special Appeals explained:

> [F]or qualified immunity to attach, the conduct must be discretionary, not
> ministerial. Additionally, the action must be within the scope of the actor's
> official duties. [The officer] meets these further standards. The decision to
> detain [the plaintiff] was clearly a discretionary act[,] and it was within [the]
> scope of [his] authority as a [law enforcement] officer to detain a suspected
> shoplifter within his jurisdiction. We hold, therefore, that [the officer], acting
> within the scope of [his] authority [as] a [law enforcement] officer enforcing
> the criminal law, is entitled to qualified public immunity, and is consequently
> shielded from civil liability in the absence of malice or gross negligence.

(Citations omitted). And, in Artis v. Cyphers, 100 Md. App. 633, 653, 642 A.2d 298, 308,

aff'd, 336 Md. 561, 649 A.2d 838 (1994) (per curiam), in commenting on a medic's

contention that he was entitled to common law public official immunity, the Court of

Special Appeals, stated:

> A similar situation exists with respect to the common law qualified immunity asserted by [the medic]; that, too, depends on a number of fact-specific elements—those relating to whether he is a public official, whether he was engaged in discretionary as opposed to ministerial acts, and whether his conduct, if negligent, constituted gross negligence.

In each of these cases, the Court of Special Appeals acknowledged or implied that gross negligence is an exception to common law public official immunity. Although the Court of Special Appeals did not state as much, such an acknowledgement may be due, in part, to Article 19 of the Maryland Declaration of Rights, and the need to provide a remedy for a public official's gross negligence.

Article 19 guarantees a remedy for an injury to a person or property by stating: "[E]very man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land." In Lee v. Cline, 384 Md. 245, 264, 863 A.2d 297, 308 (2004), this Court discussed Article 19 in the context of the MTCA and common law public official immunity, stating:

> [T]he principle that individual state officials should not be immune from suit for state constitutional violations is bound up with the basic tenet, expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong.

> While Article 19 generally prohibits a grant of immunity to both the governmental official and the governmental entity which tortuously violates a plaintiff's state constitutional rights, the effect of Article 19 upon non-constitutional torts is somewhat more fluid. The test is one of reasonableness.

(Citations and internal quotation marks omitted). This Court determined that the MTCA did not run afoul of Article 19, explaining:

> [W]ith regard to torts encompassed by the [MTCA], the statute generally waives sovereign or governmental immunity and substitutes the liability of the State for the liability of the state employee committing the tort. Accordingly, where the immunity of the [MTCA] is applicable, the injured party will ordinarily be able to recover against the State as long as he or she complies with the procedural requirements of the [MTCA].

Id. at 262, 863 A.2d at 307. This Court observed that, in contrast to the MTCA, there are "strict limitations upon public official immunity[,]" and stated:

> Under circumstances where sovereign or governmental immunity is applicable, and where public official immunity is also applicable, the person injured by governmental tortious conduct will have no remedy. For this reason, any significant expansion of public official immunity might well present serious constitutional problems under Article 19 of the Maryland Declaration of Rights.

Id. at 261-62, 863 A.2d at 307 (footnote omitted).

After careful review of the relevant principles and authorities, in accordance with the dictates of Article 19, we hold that gross negligence is an exception to common law public official immunity; in other words, if a public official's actions are grossly negligent, the public official is not entitled to common law public official immunity. To hold otherwise would effectively leave a void in liability, leaving plaintiffs, such as Respondents, without a remedy for a public official's gross negligence. We would be remiss to leave Maryland common law in this position.

To illustrate the void in liability, we created the below table:

|  | Negligence | Malice | Gross Negligence |
|---|---|---|---|
| MTCA | State liable<br>Official immune | State immune<br>Official liable | State immune<br>Official liable |
| Common Law Public Official Immunity | Official immune | Official liable | Official immune |
| Result | State liable | Official liable | **No one liable** |

In cases of gross negligence, under both the MTCA and common law public official immunity, State personnel who are also public officials, although otherwise liable under the MTCA, would nonetheless have common law public official immunity, and the State would also be immune. Succinctly put, where immunity exists under both the MTCA and common law public official immunity, the State would be liable for negligence, a public official would be liable for malice, but neither the State nor the public official would be liable for gross negligence—stated otherwise, there would be no remedy for the public official's gross negligence. This is a nonsensical result with potentially disconcerting consequences. As Respondents' counsel pointed out during oral argument, if gross negligence were not an exception to common law public official immunity, a public official and the State would have an incentive to avoid liability by arguing that the public official acted with gross negligence, and the plaintiff would be required to argue in response that the public official was "merely negligent" or malicious.

We are unpersuaded by Cooper's contention that Article 19 does not inform the application of gross negligence as an exception to common law public official immunity, and that there is no void in liability because the State has already paid Respondents for the

other correctional officers' negligence. That the State has compensated Respondents for the negligence of Scott, Surgeon, and Gaither is of no consequence. The State's payment for liability for negligence of another does not account for Cooper's liability for gross negligence; liability for negligence and liability for gross negligence are not interchangeable.[16]

Our holding that gross negligence is an exception to common law public official immunity is consistent with the reasoning underlying the MTCA. To be sure, common law public official immunity and immunity under the MTCA are distinct principles. As this Court explained in Lee, 384 Md. at 260-61, 863 A.2d at 306-07:

> The purpose of the Maryland public official immunity principle is to [e]nsure that a public *official* (and not just any government employee), in the performance of an important public duty, has the freedom and authority to make decisions and choices. The principle is aimed at permitting a public official to act according to one's judgment in the absence of a hard and fast rule. Thus, the situation where public official immunity is applicable involves a tort claim based upon alleged mis-judgment or a negligent exercise of judgment by a public official. The doctrine is intended to be a defense against claims that a "better choice" could have been made by an official. This defense is inherently related to actions based on negligence. Most alleged intentional torts, on the other hand, do not involve legitimate public policy choices or actions in the absence of a hard and fast rule.

> The immunity under the [MTCA], however, is not inherently related to negligence actions[,] in contrast to intentional tort actions. The purpose of the [MTCA]'s immunity is not simply to protect judgmental decisions by officials. Instead, the purpose of the [MTCA]'s immunity is to insulate state employees generally from tort liability if their actions are within the scope of employment and without malice or gross negligence. This broader purpose fully applies to non-malicious intentional torts and constitutional torts.

---

[16]In addition, we recognize that, in a future case, there may be a finding of gross negligence only (and not negligence), and, as such, absent our holding today, the plaintiff in that case would not recover anything from either the State or the public official.

- 43 -

(Citations and some internal quotation marks omitted) (emphasis in original). Despite the distinction between immunity under the MTCA and common law public official immunity, it is entirely consistent with the MTCA to conclude that gross negligence is an exception to common law public official immunity. In Rios v. Montgomery Cnty., 386 Md. 104, 131 n.13, 872 A.2d 1, 16 n.13 (2005), this Court noted that "[t]he [MTCA] was enacted by the General Assembly in 1984 for the purpose of creating a remedy for individuals injured by tortious conduct attributable to the State. [T]he [MTCA] . . . [was] designed to expand the individual's right to obtain remuneration for injury from the government[.]" (Citation omitted). Under the MTCA, the State waives its sovereign immunity in certain circumstances; "the State does not waive its sovereign immunity[, however,] for any tortious acts outside the scope of employment or when a 'state personnel' acts with malice or gross negligence." Barbre, 402 Md. at 175, 935 A.2d at 710 (citations omitted). Thus, where the MTCA applies, either the State or State personnel is liable for the State personnel's tortious conduct, depending on the nature of the tortious conduct.

One of the core principles of the MTCA is that it provides the State immunity for the gross negligence of State personnel, while allowing State personnel to be liable for gross negligence. The MTCA broadly defines "State personnel," in relevant part, as "a State employee or official who is paid in whole or in part by the Central Payroll Bureau in the Office of the Comptroller of the Treasury[.]" SG § 12-101(a)(1). The MTCA also lists specific examples of those who qualify as "State personnel" for purposes of the MTCA. See SG § 12-101(a)(2)–(14). By contrast, whether an individual qualifies as a "public official" for purposes of common law public official immunity has been defined narrowly

through case law.  In D'Aoust v. Diamond, 424 Md. 549, 587-88, 36 A.3d 941, 963 (2012), we noted the following "factors that are useful in determining whether an individual is a public official":

> (i) The position was created by law and involves continuing and not occasional duties.  (ii) The holder performs an important public duty.  (iii) The position calls for the exercise of some portion of the sovereign power of the State.  (iv) The position has a definite term for which a commission is issued and a bond and an oath are required.
>
> . . . [T]hese factors are not conclusive to our determination[,] and[,] even if an individual does not meet these criteria, he [or she] may nonetheless be considered a public official if he [or she] exercises a large portion of the sovereign power of government or can be called on to exercise police powers as a conservator of the peace.  . . . [S]overeign power, in its simplest terms, means the power to make and enforce laws.  The exercise of sovereign power, thus, generally contemplates someone serving in a legislative or policymaking capacity.

(Brackets, citations, footnote, internal quotation marks, and some paragraph breaks omitted).  Thus, for example, law enforcement "officers are public officials" for purposes of common law public official immunity.  Smith v. Danielczyk, 400 Md. 98, 128, 928 A.2d 795, 813 (2007) (citations omitted).  Correctional officers are also public officials.  See Livesay, 384 Md. at 12-13, 862 A.2d at 39.  Court-appointed trustees, however, are not public officials.  See D'Aoust, 424 Md. at 592, 36 A.3d at 965-66.  Here, it is undisputed that Cooper, as a correctional officer employed by the Division of Correction of the Maryland DPSCS, is a State employee for purposes of the MTCA and also a public official for purposes of common law public official immunity.  Our holding that gross negligence is an exception to common law public official immunity is consistent with the General Assembly's intent in enacting the MTCA—that State personnel should be liable for gross

- 45 -

negligence. It would be an illogical result to not accord Cooper immunity under the MTCA, but provide immunity as a public official.

Stated otherwise, it would be unreasonable to distinguish between State personnel and public officials for purposes of liability for gross negligence. Individuals who are State personnel but not public officials are liable for gross negligence under the MTCA. But, were we to hold otherwise, individuals who are both State personnel and public officials would not be liable for gross negligence. We discern no logical basis for shielding public officials from liability for gross negligence, but requiring State personnel to face liability for gross negligence.

The MTCA's legislative history supports our conclusion. In 1984, the MTCA was enacted as part of the then-new State Government Article. See 1984 Md. Laws 979, 1417-25 (Ch. 284, S.B. 50). At that time, SG § 12-104(c), concerning exclusions and limitations on the State's waiver of immunity, contained no mention of not waiving immunity for a State employee's gross negligence. See id. at 1420. SG § 12-107(d) provided, though, that "State personnel who act[ed] within the scope of the State personnel's public duties and without malice and gross negligence [was] not liable as an individual for any damages that result[ed] from tortious conduct for which immunity [was] waived under" the MTCA Id. at 1424 (capitalization omitted). The following year, the General Assembly amended the MTCA. See 1985 Md. Laws 2682, 2688 (Ch. 537, S.B. 380). One of Senate Bill 380's purposes was to "provid[e] that sovereign immunity is not waived for certain items" and to "provid[e] that State personnel are immune from certain tort suits[.]" Id. at 2682. To that end, one amendment to SG § 12-104 included adding a provision stating that

"[i]mmunity is not waived under this section for . . . any tortious act or omission of State personnel that . . . is made with malice or gross negligence[.]" Id. at 2684 (capitalization and paragraph breaks omitted). And, the provision concerning State personnel was moved from SG § 12-107(d) to SG § 12-105. See id. at 2685. Senate Bill 380's bill file included an "Explanatory Statement" prepared by the Treasurer, which stated, in relevant part:

> The [MTCA] attempts to protect both the public and State employees by waiving sovereign immunity of the State and granting sovereign immunity to State employees. However, in seeking this double objective, the categories of waiver and protection have created a sea of legal uncertainty. . . . To remedy the defects of the [MTCA], [Senate Bill] 380 proposes the following: . . . 3) State employees would be protected from tort liability for tortious acts or omissions in the course of their employment – absent malice or gross negligence.

(Paragraph breaks omitted). Senate Bill 380's bill file also contained a "Bill Analysis" by the Senate Judicial Proceedings Committee, which noted that Senate Bill 380 "establishes the State's immunity to liability for torts of State employees acting outside the scope of their duties or with malice or gross negligence." The Senate Judicial Proceedings Committee noted, though, that Senate Bill 380 "retains the provision shielding State employees from tort liability when the State can be sued and when the employees acted within the scope of their duty and without malice or gross negligence." What can be gleaned from this legislative history is that it is—and has always been—one of the purposes of the MTCA to allow State personnel to be liable for gross negligence.

The rationale underlying the MTCA immunity provision applies equally to common law public official immunity. It would be contrary to both the purpose of Article 19 and the logic of the MTCA to conclude that common law public official immunity shields

public officials from liability for their gross negligence, leaving plaintiffs effectively without a remedy for a public official's gross negligence. Already under common law public official immunity, public officials are not shielded from liability for their intentional torts or malicious acts. We decline to construe common law public official immunity in such a way that it is inconsistent with Article 19 and leaves those injured by the gross negligence of a public official without a remedy.[17]

Our holding is consistent with the manner in which other jurisdictions have addressed gross negligence through various tort claims acts, namely, someone—either the governmental entity or the government official—is liable for gross negligence under the circumstances set forth in the jurisdictions' respective tort claims acts. In other words, other jurisdictions have expressed a desire for liability to exist for gross negligence. See, e.g., J.L. v. Barnes, 33 A.3d 902, 914 (Del. Super. Ct. 2011) ("When State actors or employees are sued in their individual capacities, they are exempt from liability . . . pursuant to the [State Tort Claims Act] when: (1) the alleged act or failure to act arises out of and in connection with the performance of official duties involving the exercise of discretion; (2) the act or failure to act was done (or not done) in good faith; and (3) the act

---

[17]Respondents' counsel pointed out during oral argument that to conclude that gross negligence is not an exception to common law public official immunity would be to write the MTCA "out of the law." Respondents' counsel stated: "It would be meaningless to say in the [MTCA] that the officer's liable for gross negligence, as the [General Assembly] has, . . . but, under the common law," the officer is not liable. This point is well-taken. Indeed, not only does the current state of common law public official immunity leave a vacuum in liability, but it also permits State personnel who are public officials to be immune for gross negligence, even though they would otherwise be liable under the MTCA.

- 48 -

or failure to act was done without gross negligence. A plaintiff need only prove the absence of one of these elements to defeat qualified immunity." (Footnotes omitted)); Reilly v. Vadlamudi, 680 F.3d 617, 627 (6th Cir. 2012) ("Michigan law offers government employees immunity from tort liability under certain circumstances. Mich. Comp. Laws § 691.1407(2). Defendants are immune from liability if . . . their 'conduct did not amount to gross negligence that was the proximate cause of the injury or damage.' *Id.*" (Brackets omitted)); Jackson v. S.C. Dep't of Corr., 390 S.E.2d 467, 468 (S.C. Ct. App. 1989) (per curiam) ("[T]he Tort Claims Act states: [']The governmental entity is not liable for a loss resulting from responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any . . . , inmate, . . . , except when the responsibility or duty is exercised in a grossly negligent manner.['] Therefore if the Department [of Corrections] was grossly negligent . . . , its immunity from liability under the Act is waived." (Some ellipses in original) (paragraph breaks omitted)); Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225 (Tex. 2004) ("The Tort Claims Act expressly waives sovereign immunity in three areas . . . . [T]he Tort Claims Act further modifies a governmental unit's waiver of immunity from suit by imposing the limitations of liability articulated in the recreational use statute. . . . [A] governmental unit waives sovereign immunity under the recreational use statute and the Tort Claims Act only if it is grossly negligent." (Citations and internal quotation marks omitted)). See also Colby v. Boyden, 400 S.E.2d 184, 186 (Va. 1991) ("In Virginia, a government agent entitled to the protection of sovereign immunity is not immunized from suit. Rather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence." (Citations

omitted)); Tenn. Code Ann. § 29-20-201(b)(2) (West 2015) ("All members of boards, commissions, agencies, authorities, and other governing bodies of any governmental entity, created by public or private act, whether compensated or not, shall be immune from suit arising from the conduct of the affairs of such board, commission, agency, authority, or other governing body. Such immunity from suit shall be removed when such conduct amounts to willful, wanton, or gross negligence.").

Because public official immunity is a common law doctrine, it is entirely appropriate for this Court to define its contours. In Lee v. Cline, 384 Md. 245, 261, 863 A.2d 297, 307 (2004), we stated: "The principle of public official immunity is not, and has never been, tied to a waiver of sovereign or governmental immunity." In other words, although under the MTCA (and in other instances), the General Assembly has expressly waived sovereign or governmental immunity—and it was appropriate for the General Assembly to have acted in this regard—immunity pursuant to common law public official immunity is not a matter that requires action by the General Assembly. Instead, "this Court has authority under the Maryland Constitution to change the common law." Bowden v. Caldor, Inc., 350 Md. 4, 27, 710 A.2d 267, 278 (1998) (citations omitted). See also Telnikoff v. Matusevitch, 347 Md. 561, 593 n.29, 702 A.2d 230, 246 n.29 (1997); Owens-Illinois, Inc. v. Zenobia, 325 Md. 420, 469, 601 A.2d 633, 657 (1992) ("By changing this standard of proof . . ., we have not overruled any particular Maryland cases on the ground that they were wrongly decided at the time. Instead, we have exercised our constitutional authority to change the common law." (Citations omitted)).

This Court has noted that "the common law is not static. Its life and heart is its

- 50 -

dynamism—its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems . . . . The common law is, therefore, subject to modification by judicial decision[.]" Warr v. JMGM Grp., LLC, 433 Md. 170, 250, 70 A.3d 347, 395 (2013) (citation omitted). Although the General Assembly is the appropriate entity to waive sovereign immunity under the MTCA, common law public official immunity is a principle developed through case law by the Courts of this State. Thus, the General Assembly would not be charged with determining whether gross negligence is an exception to common law public official immunity absent codification of public official immunity.[18] Because the courts are the keepers of the common law, and because the Maryland Constitution instills within this Court the ability to determine the common law,

---

[18]Of course, we are aware that common law public official immunity has been codified by the General Assembly for certain public officials. Specifically, CJP § 5-507(a)(1) provides that "[a]n official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action." And CJP § 5-509(c)(1) provides that "an official of a special taxing district, [i.e., a member of the governing body of a special taxing district,] while acting in a discretionary capacity, without malice, and within the scope of the official's authority, is immune in an official or individual capacity from civil liability for any act or omission." In Lovelace, 366 Md. at 704, 785 A.2d at 734, we observed that the purpose of CJP §§ 5-507(b)(1) and 5-511(b) (now CJP § 5-509) "was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries." (Citation and internal quotation marks omitted). Nonetheless, despite codification of these particular aspects of common law public official immunity, common law public official immunity remains a separate, viable ground for immunity for public officials. See generally Houghton, 412 Md. at 585-91, 989 A.2d at 227-31 (This Court discussed the various grounds on which Maryland public officials may claim immunity, analyzing common law public official immunity separately from immunity under CJP § 5-507(b), CJP § 5-511(b) (now CJP § 5-509), and the MTCA.). Cooper has not contended that he is entitled to immunity under either CJP § 5-507 or CJP § 5-509; and, neither statute applies.

we are satisfied that our holding—that gross negligence is an exception to common law public official immunity—neither runs afoul of the Maryland Constitution nor invades the province of the General Assembly.

### C. Conclusion

In sum, we conclude that the special relationship exception is a limitation on the public duty doctrine, not common law public official immunity; thus, the existence of a special relationship, or lack thereof, does not govern the determination of whether a public official is entitled to common law public official immunity. We hold that gross negligence is an exception to common law public official immunity. The Court of Special Appeals was correct in holding that Cooper was not entitled to common law public official immunity, not because Cooper owed a duty arising out of a special relationship with the inmates in his custody, but instead because entitlement to common law public official immunity is limited by gross negligence. Accordingly, here, because Cooper acted with gross negligence, Cooper is not entitled to common law public official immunity.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS IN THIS COURT.**