**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1166

EDWARD MICHAEL NERO; GARRETT EDWARD MILLER,

                Plaintiffs – Appellees,

      v.

MARILYN J. MOSBY,

                Defendant – Appellant,

   and

MAJOR SAMUEL COGEN,

                Defendant.

No. 17-1168

BRIAN SCOTT RICE,

                Plaintiff – Appellee,

      v.

MARILYN J. MOSBY,

                Defendant – Appellant,

   and

MAJOR SAMUEL COGEN,

                Defendant.

ALICIA WHITE; WILLIAM PORTER,

        Plaintiffs – Appellees,

      v.

MARILYN J. MOSBY,

        Defendant – Appellant,

   and

MAJOR SAMUEL COGEN; STATE OF MARYLAND,

        Defendants.

Appeals from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge. (1:16-cv-01288-MJG; 1:16-cv-01304-MJG; 1:16-cv-02663-MJG)

Argued: December 6, 2017                 Decided: May 7, 2018

Before GREGORY, Chief Judge, WILKINSON and HARRIS, Circuit Judges.

Reversed by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Harris joined. Judge Wilkinson wrote a concurring opinion.

**ARGUED:** Karl Aram Pothier, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Andrew James Toland, III, TOLAND LAW, LLC, Sparks, Maryland; Brandy Ann Peeples, LAW OFFICE OF BRANDY A. PEEPLES, Frederick, Maryland, for Appellees. **ON BRIEF:** Brian E. Frosh, Attorney General, Michael O. Doyle, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Joseph T. Mallon, Jr., MALLON & MCCOOL, LLC, Baltimore, Maryland, for Appellees Edward Michael Nero

and Garrett Edward Miller.  David Ellin, LAW OFFICE OF DAVID ELLIN PC, Reisterstown, Maryland, for Appellee Brian Scott Rice.  Michael E. Glass, THE MICHAEL GLASS LAW FIRM, Baltimore, Maryland, for Appellees Alicia White and William Porter.

---

GREGORY, Chief Judge:

Freddie Gray, Jr., suffered fatal injuries while handcuffed and shackled in the custody of the Baltimore City Police Department. The Baltimore State's Attorney's Office, led by State's Attorney Marilyn Mosby, conducted an investigation into Gray's death. After the State Medical Examiner ruled Gray's death a homicide, Major Samuel Cogen of the Baltimore City Sheriff's Office criminally charged six of the police officers involved in Gray's arrest and detention. The same day, State's Attorney Mosby announced the charges and read the supporting probable-cause statement to the public at a press conference. A grand jury subsequently indicted the officers on substantially similar counts, but ultimately, none was convicted.

Five of the charged officers—Officer Edward Michael Nero, Officer Garrett Edward Miller, Lieutenant Brian Scott Rice, Officer William Porter, and Sergeant Alicia White ("Officers")[1]—now seek to make State's Attorney Mosby stand trial for malicious prosecution, defamation, and false light invasion of privacy. They claim that her role in independently investigating their conduct strips her of absolute prosecutorial immunity and that their bare allegations of malice or gross negligence overcome Maryland's statutory immunity protections. We resoundingly reject the invitation to cast aside decades of Supreme Court and circuit precedent to narrow the immunity prosecutors enjoy. And we find no justification for denying Mosby the protection from suit that the Maryland legislature has granted her.

---

[1] The sixth officer charged, Officer Caesar Goodson, Jr., is not a party to this case.

4

I.

A.

Because this appeal comes to us at the motion-to-dismiss stage, we recount the facts as alleged by the Officers and must accept them as true for purposes of this appeal. *See Jackson v. Lightsey*, 775 F.3d 170, 173 (4th Cir. 2014).

The morning of April 12, 2015, Lieutenant Rice encountered Freddie Gray, Jr., and another person walking along North Avenue in Baltimore City. After making eye contact with Rice, Gray and his companion ran. Rice pursued them and called for backup. Officers Miller and Nero responded; Miller chased Gray, and Nero chased Gray's companion. While pursuing Gray, Miller yelled that he had a taser and instructed Gray to get on the ground. Gray voluntarily surrendered with his hands up. Miller brought him to the ground and handcuffed him in a prone position. When Miller searched Gray, he found a knife and informed Gray that he was under arrest.

A police van arrived to transport Gray to the police station. Nero, who had failed to apprehend Gray's companion, and another officer placed Gray inside. Because a crowd of citizens was forming, the van and the officers—including Rice, Miller, Nero, and Officer Porter, who had arrived on the scene—reconvened one block south to complete the paperwork for Gray's arrest. At this second stop, Rice and Miller removed Gray from the van, replaced his handcuffs with flex cuffs, shackled his legs, and placed him back in the van. The van departed, and the officers returned to their patrol duties.

Shortly thereafter, Porter received a call from the van driver requesting assistance at another location several blocks away. Porter met the van at this third location, assisted

5

the driver with opening the van's rear doors, and observed Gray lying prone on the floor of the van. Gray asked for medical assistance. Porter informed the driver that Gray should be taken to the hospital, and then he left.

Meanwhile, Miller and Nero returned to North Avenue, where they arrested another person and called for a police van and additional units. The van carrying Gray responded to this fourth location, as did Porter and Sergeant White, who had already "received supervisor complaints" about Gray's arrest. J.A. 169. The second arrestee was placed in the van. Gray again communicated to Porter that he wanted medical assistance. White separately attempted to speak with Gray, but Gray did not respond. Porter and White returned to their vehicles and followed the van to the Western District police station.

At the police station, Gray was found unconscious in the back of the van. An officer rendered emergency assistance, and Porter called a medic. White confirmed that a medic was en route. Gray was taken to the University of Maryland Shock Trauma Unit, where he died due to a neck injury on April 19, 2015. The State Medical Examiner ruled Gray's death a homicide.

On May 1, 2015, Major Cogen executed an application for Statement of Charges for each of the five Officers, plus the driver of the van. Each application contained the same affidavit, sworn by Major Cogen, reciting the facts supporting probable cause. The affidavit explained that Rice, Miller, and Nero illegally arrested Gray without probable cause because the knife found on him was legal: "The blade of the knife was folded into the handle. The knife was not a switchblade knife and is lawful under Maryland law." J.A. 35. The affidavit further stated that the officers repeatedly failed to seatbelt Gray in the

6

back of the van, contrary to a Baltimore City Police Department General Order. It noted that Porter observed Gray on the floor of the van, but "[d]espite Mr. Gray's seriously deteriorating medical condition, no medical assistance was rendered to or summonsed for Mr. Gray at that time." J.A. 37. And, the affidavit asserted, "White, who was responsible for investigating two citizen complaints pertaining to Mr. Gray's illegal arrest, spoke to the back of Mr. Gray's head. When he did not respond, she did nothing further despite the fact that she was advised that he needed a medic. She made no effort to look, assess or determine his condition." J.A. 37.

A Maryland district court commissioner approved the applications and issued warrants for the Officers' arrests. Nero and Miller were each charged with two counts of assault in the second degree, two counts of misconduct in office, and false imprisonment. Rice was charged with manslaughter, two counts of assault in the second degree, two counts of misconduct in office, and false imprisonment. Porter and White were each charged with manslaughter, assault in the second degree, and misconduct in office.

Later that day, State's Attorney Mosby held a press conference to announce the charges and call for an end to the riots that had erupted in Baltimore following Gray's death. She told the public, "The findings of our comprehensive, thorough and independent investigation, coupled with the medical examiner's determination that Mr. Gray's death was a homicide . . . has led us to believe that we have probable cause to file criminal charges." J.A. 29. She then read the full statement of probable cause verbatim.

During the press conference, Mosby emphasized that she and her office independently investigated Gray's death:

7

It is my job to examine and investigate the evidence of each case and apply those facts to the elements of a crime, in order to make a determination as to whether individuals should be prosecuted. . . . [I]t is precisely what I did in the case of Freddie Gray.

Once alerted about this incident on April 13, investigators from my police integrity unit were deployed to investigate the circumstances surrounding Mr. Gray's apprehension. . . . [M]y team worked around the clock; 12 and 14 hour days to canvas and interview dozens of witnesses; view numerous hours of video footage; repeatedly reviewed and listened to hours of police video tape statements; surveyed the route, reviewed voluminous medical records; and we leveraged the information made available by the police department, the community and family of Mr. Gray.

J.A. 29. Mosby concluded her speech by calling for peace in Baltimore as she moved forward with the charges:

To the people of Baltimore and the demonstrators across America: I heard your call for 'No justice, no peace.' Your peace is sincerely needed as I work to deliver justice on behalf of this young man. . . .

[T]o the youth of the city[,] I will seek justice on your behalf. This is a moment. This is your moment. Let's insure we have peaceful and productive rallies that will develop structural and systemic changes for generations to come. You're at the forefront of this cause and as young people, our time is now.

J.A. 32–33.

On May 21, 2015, a grand jury indicted all six officers on charges substantially similar to those listed in the Statements of Charges. Porter was tried before a jury, and after the jury could not reach a unanimous verdict, the judge declared a mistrial. Nero and Rice underwent bench trials, and the judge ultimately found them not guilty on all counts. Thereafter, Mosby dismissed all outstanding charges against Miller, White, and Porter.

8

B.

While the criminal charges against all of the Officers were still pending, the Officers sued State's Attorney Mosby. The Officers claimed that she violated their rights by bringing charges without probable cause and defamed the Officers by making false accusations against them at the May 1, 2015 press conference.[2] The Officers filed three separate suits—one brought by Nero and Miller in the district court; one brought by Rice, also in the district court; and one brought by Porter and White in state court but removed to the district court. The district court consolidated the three cases. The Officers alleged, in relevant part, a 28 U.S.C. § 1983 claim for malicious prosecution under the Fourth Amendment, a claim for malicious prosecution under Article 26 of the Maryland Declaration of Rights, and common-law claims for malicious prosecution, defamation, and false light invasion of privacy.[3]

Mosby moved to dismiss the Officers' claims, asserting various immunities. She asserted absolute prosecutorial immunity, or alternatively qualified immunity, for the § 1983 malicious-prosecution claim; absolute prosecutorial immunity under Maryland common law and statutory immunity under the Maryland Tort Claims Act (MTCA) for the state malicious-prosecution claims; and MTCA immunity and common-law public-official

---

[2] The Officers also sued Major Cogen and the State of Maryland, but because neither is a party to this appeal, we need not address the claims against them here.

[3] The complaints also alleged claims for unreasonable seizure under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights, false arrest, false imprisonment, abuse of process, and civil conspiracy; however, the district court dismissed these counts for failure to state a claim, and the Officers do not challenge that decision on appeal.

9

immunity for the defamation and false-light claims. Mosby further argued that the Officers failed to state claims on which relief could be granted.

After a hearing, the district court allowed the three malicious-prosecution claims, the defamation claim, and the false-light claim to proceed. *Nero v. Mosby*, 233 F. Supp. 3d 463, 489 (D. Md. 2017). The court held that, although Mosby was entitled to absolute immunity for her conduct before the grand jury, she was not entitled to absolute immunity for any of her actions prior to convening the grand jury. *Id.* at 483–86. The court further concluded that the Officers had pled sufficient facts to overcome Mosby's qualified-immunity and MTCA-immunity defenses to the malicious-prosecution claims at the motion-to-dismiss stage. *Id.* at 486–88. And the court determined that Mosby was not entitled to any conditional privileges for the defamation and false-light claims. *Id.* at 478–80. The court did not expressly address Mosby's immunity defenses to these latter two claims.

Mosby timely appealed. She challenges the district court's denial of immunity for the § 1983 malicious-prosecution claim, the denial of immunity for the state malicious-prosecution claims, and the failure to grant immunity for the defamation and false-light claims. We address each challenge in turn.

II.

We begin with the Officers' § 1983 malicious-prosecution claim and State's Attorney Mosby's assertion of absolute prosecutorial immunity. We have jurisdiction to review the district court's denial of absolute immunity for this claim pursuant to 28 U.S.C.

10

§ 1291 and the collateral order doctrine. *See Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982); *Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002). We review denials of absolute immunity de novo. *See Goldstein v. Moatz*, 364 F.3d 205, 211 (4th Cir. 2004).

A.

Absolute immunity protects "the vigorous and fearless performance of the prosecutor's duty" that is so essential to a fair, impartial criminal justice system. *Imbler v. Pachtman*, 424 U.S. 409, 427–28 (1976). As representatives of the people, prosecutors have a responsibility to enforce the laws evenhandedly and to exercise independent judgment in seeking justice. *See id.* at 423–24. "The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Id.* at 424–25. No matter how conscientious a prosecutor may be, "a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate." *Id.* at 425. Without immunity from suit, this threat of retaliatory litigation would predispose prosecutors to bring charges based not on merit but on the social or political capital of prospective defendants. *See id.* at 438 (White, J., concurring) ("[T]he fear of being harassed by a vexatious suit, for acting according to their consciences would always be greater where powerful men are involved." (internal quotation marks omitted)).

The protection that absolute immunity affords "is not grounded in any special 'esteem for those who perform [prosecutorial] functions, and certainly not from a desire to shield abuses of office.'" *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quoting *Malley v.*

11

*Briggs*, 475 U.S. 335, 342 (1986)).  Rather, it stems from courts' recognition that "any lesser degree of immunity could impair the judicial process itself."  *Id.* (quoting *Malley*, 475 U.S. at 342).

Because absolute immunity safeguards the process, not the person, it extends only to actions "intimately associated with the judicial phase of the criminal process."  *Imbler*, 424 U.S. at 430–31.  All other actions are entitled only to qualified immunity.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  To determine whether a particular act is "intimately associated with the judicial phase," *Imbler*, 424 U.S. at 430, we employ a functional approach.  We look to "the nature of the function performed," without regard to "the identity of the actor who performed it," "the harm that the conduct may have caused," or even "the question whether it was lawful."  *Buckley*, 509 U.S. at 269, 271 (internal quotation marks and citation omitted).  The official claiming absolute immunity "bears the burden of showing that such immunity is justified for [each] function in question."  *Burns v. Reed*, 500 U.S. 478, 486 (1991).

In applying this functional approach, the Supreme Court has distinguished between advocative functions and investigative or administrative functions, holding that the former enjoy absolute immunity but the latter do not.  *See Kalina*, 522 U.S. at 125–26.  A prosecutor acts as an advocate when she professionally evaluates evidence assembled by the police, *Buckley*, 509 U.S. at 273, decides to seek an arrest warrant, *Kalina*, 522 U.S. at 130, prepares and files charging documents, *id.*, participates in a probable cause hearing, *Burns*, 500 U.S. at 492, and presents evidence at trial, *Imbler*, 424 U.S. at 431.  In contrast, a prosecutor does not act as an advocate, but rather in an investigative or administrative

12

capacity, when she gives legal advice to police during an investigation, *Burns*, 500 U.S. at 493, investigates a case before a probable cause determination, *Buckley*, 509 U.S. at 274, and personally attests to the truth of averments in a statement of probable cause, *Kalina*, 522 U.S. at 129.

B.

Mosby's alleged wrongs fall squarely under the umbrella of absolute immunity. Mosby correctly argued that the specific conduct the Officers challenge was within her role as an advocate. Therefore, the district court should have dismissed the § 1983 malicious-prosecution claim.

1.

The gravamen of the Officers' complaints is that Mosby and her office conducted an investigation into Gray's death, and despite finding no evidence of criminal wrongdoing, Mosby either instructed Cogen to file false charges or erroneously advised him that probable cause supported the charges. The Officers contend that Mosby brought charges against them "for the purpose of stopping the riots rather than prosecuting charges supported by probable cause." J.A. 183.

The Officers also allege that Mosby misrepresented facts in the applications for Statement of Charges that Cogen executed and filed. They claim that Mosby included false information—e.g., that the knife found on Gray was legal, that the Officers' failure to seatbelt Gray was a crime, and that the Officers were aware Gray was in medical distress prior to arriving at the police station. And they claim that she omitted key facts—e.g., that the second arrestee placed in the police van reported Gray was conscious and banging his

13

head against the wall, that another officer observed Gray was not in medical distress, and that the medics who examined Gray at the police station reported his neck was normal.

At bottom, the Officers take issue with Mosby's decision to prosecute them and her role in preparing the charging documents.

2.

These claims are barred by settled Supreme Court and circuit precedent. In *Kalina*, the Supreme Court held that a prosecutor's "selection of the particular facts to include in the certification" of probable cause, "her drafting of the certification, her determination that the evidence was sufficiently strong to justify a probable-cause finding, her decision to file charges, and her presentation of the information" to the court are all entitled to absolute immunity. 522 U.S. at 130. And, in *Springmen*, we held that a Maryland Assistant State's Attorney enjoyed absolute immunity for reviewing an application for Statement of Charges prepared by a police officer and for advising the officer that the facts were sufficiently strong to proceed with filing the application. *Springmen v. Williams*, 122 F.3d 211, 212 (4th Cir. 1997).

We see no material difference between the conduct protected in *Kalina* and *Springmen* and the acts the Officers allege here. Mosby's assessment of the evidence— the knife, the failure to seatbelt Gray, information regarding what the Officers knew about Gray's medical condition before finding him unconscious—and her conclusion that it supported probable cause mirror the prosecutor's "determination" in *Kalina* "that the evidence was sufficiently strong to justify a probable-cause finding." *See* 522 U.S. at 130. Mosby's alleged instruction to Cogen to file charges against the Officers is tantamount to

14

a "decision to file charges" under *Kalina*. *See id.* And that decision is absolutely immune regardless of its motivation. *See id.*; *Buckley*, 509 U.S. at 271. Mosby's advice to Cogen that there was probable cause to charge the Officers is indistinguishable from that in *Springmen*, where the Assistant State's Attorney advised a police officer that the facts in an application for Statement of Charges were sufficient to warrant filing. *See* 122 F.3d at 212. And, assuming Mosby helped write the application here, both her characterization of the facts and her decision to provide some facts while omitting others fall within *Kalina*'s "drafting of the certification" of probable cause and "selection of the particular facts to include." *See* 522 U.S. at 130.

We reject the argument, as we did in *Springmen*, that providing legal advice to police is never entitled to absolute immunity. *See* 122 F.3d at 213–14. To be sure, the Supreme Court held in *Burns* that "advising police in the *investigative phase* of a criminal case" is not "so intimately associated with the judicial phase of the criminal process that it qualifies for absolute immunity." 500 U.S. at 493 (emphasis added) (internal quotation marks and citation omitted). But the Court has not retreated from the principle that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings"— including "the professional evaluation of the evidence assembled by the police"—are absolutely immune. *Buckley*, 509 U.S. at 273. Where, as here, plaintiffs allege that a prosecutor initiated charges against them by informing a police officer that the evidence gathered amounted to probable cause and directing the officer to file charges, the prosecutor is entitled to absolute immunity. *Springmen*, 122 F.3d at 213–14.

15

We also reject the Officers' argument that Mosby's involvement in the investigation of Gray's death strips her of absolute immunity. Certainly, prosecutors enjoy only qualified immunity for their actions before securing probable cause for an arrest. *Buckley*, 509 U.S. at 274. And Mosby apparently began investigating before she had probable cause. *See* J.A. 29 ("Once alerted about this incident on April 13, investigators from my police integrity unit were deployed to investigate the circumstances surrounding Mr. Gray's apprehension."). But conducting an investigation is not actionable—in fact, it was Mosby's *responsibility* to investigate—and the Officers make no specific allegation that Mosby engaged in misconduct during that investigation.[4]

To the extent the Officers ask us to create a new rule that participation in an investigation deprives a prosecutor's subsequent acts of absolute immunity, we balk at the proposition. Such a rule would not only upend the functional approach that the Supreme Court has articulated and applied for decades, *see Buckley*, 509 U.S. at 269–70, but it would effectively eliminate prosecutorial immunity in police-misconduct cases. Most jurisdictions, including Baltimore, charge prosecutors with independently investigating cases of criminal behavior by police.[5] Per the Officers' theory, whenever a prosecutor

---

[4] The Officers claimed that the State's Attorney's Office "manipulated evidence to facilitate [the] indictments," J.A. 176, that "Mosby created false facts and omitted material facts," J.A. 179, and that she "conduct[ed] a bogus and sham investigation," J.A. 179. But, absent specific supporting facts, these conclusory allegations are "not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

[5] *See* J.A. 29; *see generally* Isaac G. Lara, Note, *Shielded from Justice: How State Attorneys General Can Provide Structural Remedies to the Criminal Prosecutions of Police Officers*, 50 Colum. J.L. & Soc. Probs. 551 (2017) (discussing models states have adopted to investigate police shootings).

16

takes on one of these cases, her actions—even those intimately tied to the judicial phase—no longer enjoy absolute immunity. This approach torpedoes the fundamental premise of absolute prosecutorial immunity: ensuring a fair, impartial criminal justice system, in which prosecutors have the independence to hold even powerful wrongdoers accountable without fear of vexatious litigation. *See Imbler*, 424 U.S. at 424–25; *id.* at 438 (White, J., concurring). And we refuse to sanction it. When determining whether a prosecutor is entitled to absolute immunity, we look at the specific act challenged, not the prosecutor's preceding acts. *See Burns*, 500 U.S. at 487 (noting that "it is important to determine the precise claim" that plaintiff made concerning defendant's conduct).

For the foregoing reasons, Mosby's absolute-immunity defense plainly defeats the Officers' § 1983 claim. Holding otherwise would require us to rewrite the doctrine of absolute prosecutorial immunity. This we will not do.

III.

Having determined that State's Attorney Mosby is entitled to absolute immunity for the Officers' § 1983 claim, we turn to the Officers' state malicious-prosecution claims, brought under the Maryland Declaration of Rights and Maryland common law. Mosby asserted Maryland common-law absolute prosecutorial immunity and MTCA immunity, but the district court denied both defenses. *Nero*, 233 F. Supp. 3d at 483–87. The Officers argue that we lack jurisdiction over this aspect of the district court's decision. We disagree and further conclude that Mosby's absolute-prosecutorial-immunity defense bars both state

17

malicious-prosecution claims. Because we dispose of these claims on common-law immunity grounds, we need not reach whether Mosby is also entitled to MTCA immunity.

A.

Our jurisdiction is limited to appeals "from final decisions of the district courts." 28 U.S.C. § 1291. Although the denial of a motion to dismiss is generally not a "final" judgment, the collateral order doctrine renders such an order final for purposes of our jurisdiction in certain narrow circumstances. *See Gray-Hopkins*, 309 F.3d at 229. Specifically, we have jurisdiction over an order if "it conclusively determines the disputed question, resolves an important issue completely separate from the merits of the action, and would be effectively unreviewable on appeal from a final judgment." *Id.* (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)).

Orders denying immunity often fall within the collateral order doctrine. *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (federal qualified immunity); *Nixon*, 457 U.S. at 742 (federal absolute immunity). But "[o]nly a claimed *immunity from suit*, not a mere defense to liability," satisfies the doctrine's requirements and thus can provide a basis for our jurisdiction. *Davis v. City of Greensboro*, 770 F.3d 278, 281 (4th Cir. 2014) (internal quotation marks omitted). Unlike a defense to liability, which confers only a right not to pay damages, an immunity from suit confers a right not to bear the burdens of litigation and cannot be "effectively vindicated" after litigation. *See Mitchell*, 472 U.S. at 525–27. To determine the nature and scope of an asserted state-law immunity, we look to state substantive law. *Davis*, 770 F.3d at 281.

18

Here, Maryland law indicates that the state's common-law absolute prosecutorial immunity confers a right to be free from litigation. In *Gill v. Ripley*, the Maryland Court of Appeals adopted the U.S. Supreme Court's rule that prosecutors enjoy absolute immunity in suits for conduct intimately related to the judicial process. 724 A.2d 88, 96 (Md. 1999). The court recognized that prosecutorial immunity "arose initially as an adjunct to the doctrine of judicial immunity," *id.* at 91, which was established "to forestall endless collateral attacks on judgments through civil actions against the judges themselves," *id.* at 91–92 (quoting *Parker v. State*, 653 A.2d 436, 443 (Md. 1995)). The court noted that absolute prosecutorial immunity was based on the same considerations, including "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 94 (quoting *Imbler*, 424 U.S. at 422–23). Accordingly, the court concluded that absolute immunity was necessary to protect prosecutors' decision making "from the harassment and intimidation associated with *litigation*"—not just damages liability. *See id.* at 95 (quoting *Burns*, 500 U.S. at 494) (emphasis added).[6]

For these reasons, before *Gill* was decided, the Supreme Court had deemed absolute prosecutorial immunity a "complete protection from suit." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *accord Mitchell*, 472 U.S. at 525 ("[T]he essence of absolute immunity

_____

[6] Prior to *Gill*, Maryland courts had stated in passing that "judges have an absolute privilege from suits arising out of their judicial acts," and "[p]rosecutors in judicial hearings are afforded the same privilege." *Simms v. Constantine*, 688 A.2d 1, 7 n.2 (Md. App. 1997) (quoting *Eliason v. Funk*, 196 A.2d 887, 889–90 (Md. 1964)).

19

is its possessor's entitlement not to have to answer for his conduct in a civil damages action."). And the *Gill* court endorsed the Supreme Court's prosecutorial-immunity doctrine without qualification: "There is no reason to depart from [the Supreme Court's] approach with respect to prosecutorial immunity." *Gill*, 724 A.2d at 96. Thus, we see no reason to construe the nature of absolute prosecutorial immunity under Maryland common law differently than the same immunity under federal common law.

We recognize that the denial of absolute prosecutorial immunity would not be immediately appealable under Maryland's collateral order doctrine. *See Md. Bd. of Physicians v. Geier*, 154 A.3d 1211, 1228–29 (Md. 2017) (holding that denial of quasi-judicial immunity did not satisfy Maryland's collateral order doctrine); *Dawkins v. Balt. City Police Dep't*, 827 A.2d 115, 122 (Md. 2003) (stating that denial of any immunity asserted by government official other than "Governor, Lieutenant Governor, Comptroller, Treasurer, Attorney General, Speaker of the House, President of the Senate, or judges" is not appealable under Maryland's collateral order doctrine). But Maryland's collateral order doctrine does not apply in federal court. We apply federal procedural rules—here, the federal collateral order doctrine—and look to state law only to determine whether the claimed immunity is an immunity from suit, versus an immunity from liability. *Gray-Hopkins*, 309 F.3d at 231 ("In determining whether appellate jurisdiction exists[,] the parties in a federal action such as this one involving pendent state claims, are bound by federal procedural rules governing appeals, including the collateral order doctrine. We must look to substantive state law, however, in determining the nature and scope of a claimed immunity." (internal quotation marks, citations, and alterations omitted)). Given

20

the Court of Appeals' discussion in *Gill v. Ripley* regarding absolute prosecutorial immunity, we are confident Maryland courts would hold that such immunity is an immunity from suit. *See* 724 A.2d at 94–96.

In arguing otherwise, the Officers rely on the Court of Appeals' opinion in *Dawkins*. But *Dawkins* dealt with Maryland's procedural rules—not the substantive right that absolute prosecutorial immunity confers. *See* 827 A.2d at 120–22. There, the Court of Appeals held that interlocutory orders denying "*any*" type of immunity are "not appealable under the Maryland collateral order doctrine" except in "extraordinary situations." *Id.* at 121–22 (emphasis added). Maryland's collateral order doctrine, like its federal counterpart, applies only to orders that "would be effectively unreviewable if the appeal had to await the entry of a final judgment." *Id.* at 118 (citation omitted). Yet the *Dawkins* court rejected the federal-court rule that a claim of immunity from suit would be "effectively unreviewable" at the end of litigation. *Id.* at 118, 120 ("[T]he claimed right of immunity from trial itself does not suffice to satisfy the 'unreviewability' requirement[.]" (citation omitted)). The court expressed concern that such a rule would cause "a proliferation of appeals under the collateral order doctrine" and "be flatly inconsistent with the long-established and sound public policy against piecemeal appeals." *Id.* at 119 (citation omitted). Accordingly, the court added another requirement to the doctrine—that the challenged order present an "extraordinary situation." *See id.* at 121. While this additional procedural requirement narrowed the pool of collateral orders eligible for immediate review, it did not change the nature of the immunities available to government officials under Maryland substantive law.

21

The collateral order doctrine strikes a balance between courts' interest in protecting government officials entitled to immunity from burdensome litigation and the competing interest in not overburdening appellate courts with piecemeal appeals. *See Will v. Hallock*, 546 U.S. 345, 351–53 (2006); *Dawkins*, 827 A.2d at 121. The federal courts have determined that the need to resolve absolute prosecutorial immunity disputes "at the earliest possible stage of litigation" outweighs concerns about encumbering appellate courts with interlocutory appeals. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Will*, 546 U.S. at 350–52. Maryland courts have struck a different balance, instead limiting interlocutory appeals involving immunity questions to "extraordinary situations." *See Dawkins*, 827 A.2d at 119–21. But Maryland's policy choice—to err on the side of reducing piecemeal appeals—does not transform an immunity from suit into an immunity from liability.

Even if absolute prosecutorial immunity could be construed under Maryland law as merely an immunity from liability, and thus outside the scope of the collateral order doctrine, we would still have pendent appellate jurisdiction here. Pendent appellate jurisdiction permits appellate courts to "retain the discretion to review issues that are not otherwise subject to immediate appeal when such issues are so interconnected with immediately appealable issues that they warrant concurrent review." *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006). Two issues are sufficiently interconnected when they are "inextricably intertwined"—i.e., they involve "the same specific question," and resolution of the appealable issue necessarily resolves the other. *Scott v. Family Dollar*

22

*Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013) (citation omitted).[7] The Officers' § 1983 malicious-prosecution claim is based on the same facts as their state malicious-prosecution claims, and Mosby's federal and state absolute-immunity defenses raise identical issues. As explained above, Maryland has adopted wholesale the federal doctrine of absolute prosecutorial immunity. *Gill*, 724 A.2d at 96. Thus, our resolution of Mosby's absolute-immunity defense to the § 1983 claim necessarily resolves her absolute-immunity defense to the corresponding state claims. *See Scott*, 733 F.3d at 111 (exercising pendent appellate jurisdiction where resolution of appealable and non-appealable orders turned on interpretation of same law).

In sum, we have jurisdiction to review the district court's denial of Mosby's claimed absolute-immunity defense to the state malicious-prosecution claims both under the federal collateral order doctrine and via our pendent appellate jurisdiction.

B.

In Part II.B, we held that Mosby is entitled to absolute prosecutorial immunity for the Officers' § 1983 malicious-prosecution claim under federal common law. Because the Officers' § 1983 malicious-prosecution claim and their state malicious-prosecution claims rest on the same facts, and absolute prosecutorial immunity is the same under federal law and Maryland law, we also hold that Mosby is entitled to absolute prosecutorial immunity for the Officers' state malicious-prosecution claims under Maryland common law.

---

[7] The interconnected requirement is also met where "review of [the] jurisdictionally insufficient issue is necessary to ensure meaningful review of [the] immediately appealable issue." *Id.* (internal quotation marks and citation omitted).

23

IV.

Finally, we address the Officers' state-law defamation and false-light claims, which arise from Mosby's press-conference statements. As a defense to these claims, Mosby asserted statutory immunity under the MTCA and public-official immunity under Maryland common law. The district court declined to dismiss the press-conference torts, finding that the Officers had alleged sufficient facts to state plausible claims for relief and that Mosby was not entitled to the fair reporting or fair comment privileges. *Nero*, 233 F. Supp. 3d at 476–80. The district court did not expressly address Mosby's immunity defenses to the defamation and false-light claims. *See id.* The Officers maintain that we do not have jurisdiction to review the district court's decision as to these state claims. We again disagree and hold that the MTCA bars the Officers from bringing suit based on Mosby's press-conference statements. Because we dispose of the press-conference torts on statutory-immunity grounds, we need not reach whether Mosby is also entitled to public-official immunity.

A.

Under the collateral order doctrine, we have jurisdiction to review the district court's order denying Mosby's motion to dismiss the defamation and false-light claims if the order denies an immunity from suit and thereby "conclusively determines" the immunity question. *See Gray-Hopkins*, 309 F.3d at 229; *see also supra* Part III.A. We first look to state substantive law to determine the nature and scope of the claimed MTCA immunity and then consider whether the district court's order in fact denied Mosby such immunity.

24

Maryland's legislature has made clear that the MTCA confers a right to be free from suit. The MTCA provides in relevant part that "State personnel," including State's Attorneys, "are *immune from suit* in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (emphasis added); *see* Md. Code Ann., State Gov't § 12-101(a)(8) (defining "State personnel" to include State's Attorneys). The plain language of the statute grants State's Attorneys immunity from tort lawsuits that are based on actions taken within the scope of employment and without malice or gross negligence. *See Barbre v. Pope*, 935 A.2d 699, 716 (Md. 2007) ("[F]or a State employee to be granted immunity from suit by the MTCA, he must act within the scope of his public duties and without malice or gross negligence[.]" (internal quotation marks and brackets omitted)); *Ford v. Balt. City Sheriff's Office*, 814 A.2d 127, 142 (Md. App. 2002) ("[T]he MTCA permits suit against the State for a negligent violation of the State Constitution by State personnel, but State personnel shall be immune from such suits.").

Indeed, the statute's mention of *both* immunity from suit *and* immunity from liability requires us to conclude that it confers both a right to be free from suit and a right to be free from liability. "When we interpret statutes, we must 'construe all parts to have meaning'" and "avoid interpretations that would turn some statutory terms into nothing more than surplusage." *United States v. Briley*, 770 F.3d 267, 273 (4th Cir. 2014) (quoting *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004)). Reading the MTCA to grant

25

only immunity from liability would render the phrase "immune from suit" meaningless. *See Litz v. Md. Dep't of Env't*, 131 A.3d 923, 938 n.18 (Md. 2016) ("[T]he MTCA provides state employees with direct immunity from suit, whereas the LGTCA grants to local government employees only immunity from damages, not from suit."); *Bd. of Educ. of Prince George's Cty. v. Marks-Sloan*, 50 A.3d 1137, 1155 (Md. 2012) ("In contrast to the complete immunity from suit given to State personnel under the MTCA, local government employees are granted only an immunity from damages under the LGTCA.").

To be sure, Maryland's Court of Appeals has stated that "interlocutory trial court orders rejecting defenses of . . . statutory immunity . . . are not appealable under the Maryland collateral order doctrine." *Dawkins*, 827 A.2d at 122. But, again, this restriction on the immediate appealability of a denial of MTCA immunity is a function of Maryland's collateral order doctrine, not the scope of the immunity itself. *See supra* Part III.A. The statute clearly states that MTCA immunity is an "immunity from suit." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). "When a policy is embodied in a constitutional or statutory provision entitling a party to immunity from suit (a rare form of protection), there is little room for the judiciary to gainsay its 'importance.'" *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994).

## 2.

Because MTCA immunity protects Maryland State's Attorneys from suit, the district court's decision to allow the Officers' defamation and false-light claims to go forward conclusively determined that Mosby was not entitled to MTCA immunity. Permitting a suit to proceed beyond the dismissal stage in spite of an immunity defense

26

"subjects the official to the burdens of pretrial matters, and some of the rights inherent in [the] immunity defense are lost." *Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc). Accordingly, we have held that a district court's refusal to rule on an immunity-from-suit defense decided the immunity question for purposes of the collateral order doctrine. *See id.* Here, the district court denied Mosby's motion to dismiss the defamation and false-light claims but did not expressly reject the MTCA-immunity defense she asserted to those claims. *Nero*, 233 F. Supp. 3d at 476–80. Yet forcing Mosby to continue to litigate these claims necessarily deprived her of the immunity Maryland granted State's Attorneys in the MTCA. *See Marks-Sloan*, 50 A.3d at 1155 (noting that MTCA gives State personnel "complete immunity from suit"). We therefore conclude that the district court's decision denied Mosby immunity from suit and is appealable under the collateral order doctrine.

## B.

Satisfied that we have jurisdiction to review the district court's ruling on the press-conference torts, we turn to the merits of Mosby's MTCA-immunity claim. The Officers allege that, at the press conference, Mosby defamed them and invaded their privacy by placing them before the public in a false light. The MTCA bars these claims if Mosby's press-conference statements were "within the scope of [her] public duties" and "made without malice or gross negligence." Md. Code Ann., Cts. & Jud. Proc. § 5-522(b). Whether the complaints allege sufficient facts to overcome Mosby's assertion of MTCA immunity is a question of law that we review de novo. *See Marks v. Dann*, 600 F. App'x 81, 84–85 (4th Cir. 2015); *Chinwuba v. Larsen*, 790 A.2d 83, 115 (Md. App. 2002)

(hereinafter "*Chinwuba I*"), *aff'd in part, rev'd in part on other grounds*, 832 A.2d 193 (Md. 2003).

1.

At least two of the Officers allege, somewhat confusingly, that by holding the press conference and reading the statement of probable cause, Mosby acted both within the scope of her employment and outside it. *Compare* J.A. 185 ("At all times, Defendants Mosby and Cogen were acting . . . within the scope of their employment[.]"), *with* J.A. 188 ("Defendant Mosby went outside the scope of her employment as a State's Attorney by holding a press conference, acting in an investigative capacity, [and] reading the statement of charges to the public[.]"). We agree with the former assertion.

The MTCA's within-the-scope-of-employment requirement "is coextensive with the common law concept of 'scope of employment' under the doctrine of respondeat superior." *Larsen v. Chinwuba*, 832 A.2d 193, 200 (Md. 2003) (hereinafter "*Chinwuba II*") (quoting *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991)). Per that doctrine, conduct falls within the scope of employment when it is "authorized by the employer" and "in furtherance of the employer's business." *Id.* at 200 (internal quotation marks and citation omitted). The conduct need not be "intended or consciously authorized," so long as it is "of the same general nature as that authorized" or "incidental to the conduct authorized." *Id.* at 201.

The Maryland Court of Appeals has held that the head of an executive agency acts within the scope of her employment when she shares with the public information about the agency's activities to further the agency's mandate. In *Chinwuba*, the Commissioner of

28

the Maryland Insurance Administration, while conducting an investigation into a Maryland health maintenance organization (HMO), allegedly disclosed to the press letters he had sent to the HMO and made statements to the press about the investigation. *Chinwuba II*, 832 A.2d at 194, 196. The HMO sued the Commissioner for defamation and false light invasion of privacy, and the Commissioner asserted MTCA immunity in defense. *Id.* The court held that the Commissioner's disclosure and statements to the press were within the scope of his employment. *Id.* at 201. It reasoned that "the head of a major agency in the executive branch of government is authorized to disclose to the public matters concerning the agency's operations." *Id.* Moreover, the "disclosures were made during the regular course of business," "related entirely to the operations of the Insurance Administration," and "incidental to the business of managing the Insurance Administration." *Id.* Had the Commissioner acted not in furtherance of the agency's business but for his own personal benefit, however, his disclosures would not have been protected. *Id.* at 202 (citing *Sawyer*, 587 A.2d at 471, and *Ennis v. Crenca*, 587 A.2d 485, 489–91 (Md. 1991)).

Applying these principles here, Mosby's press-conference statements clearly fell within the scope of her employment. As Baltimore City's State's Attorney, Mosby was elected by the people of Baltimore to lead the city's State's Attorney's Office, a key agency in Maryland's state government. *See* Md. Const., Art. 5, § 7. The State's Attorney's Office houses Baltimore's Police Integrity Unit and prosecutes crimes on behalf of the public. *See* Md. Code Ann., Crim. Pro. § 15-102. At the press conference, Mosby informed the public that her Police Integrity Unit had conducted an investigation into Freddie Gray's death, found probable cause to believe that the Officers had committed numerous crimes, and

29

initiated criminal prosecutions against them. Like the Insurance Commissioner's disclosures in *Chinwuba*, these statements "were made during the regular course of business" and "related entirely to the operations" of her office. *See Chinwuba II*, 832 A.2d at 201. Mosby also called for peace in Baltimore as she prosecuted the Officers. Such an appeal to the public to comply with the law was certainly "incidental," if not directly related, to her role as the chief law enforcement officer in the city. *See id.*

The Officers allege that Mosby used their arrests "for her own personal interests and political agendas" and thus acted outside the scope of her employment. Appellees' Br. 42 (internal quotation marks omitted). But their argument is entirely devoid of support. The statements they cite—"I heard your call for 'No justice, no peace,'" "your peace is sincerely needed as I work to deliver justice," and "I will seek justice on your behalf"—simply do not give rise to a reasonable inference that Mosby acted for reasons other than furthering the operations of the State's Attorney's Office. *See id.* (quoting J.A. 32–33). The people of Baltimore elected Mosby to deliver justice. *See* Md. Const., Art. 5, § 7. A young African-American man had been killed in the custody of the Baltimore City Police Department, and the city was rioting. Pursuing justice—i.e., using the legal system to reach a fair and just resolution to Gray's death—was not a political move. It was Mosby's duty. And Mosby was well within her role to tell the people of Baltimore, and the nation, that she was carrying out that duty. *Cf. Miner v. Novotny*, 498 A.2d 269, 275 (Md. 1985) ("The viability of a democratic government requires that the channels of communication between citizens and their public officials remain open and unimpeded."). That Mosby may gain

some future career advantage for doing her job well does not take her actions outside the scope of her employment.

2.

The Officers further assert that Mosby is not entitled to MTCA immunity because she made the press-conference statements with either malice or gross negligence. But the allegations in the complaints simply cannot sustain such a finding.

For MTCA purposes, malice is "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Barbre*, 935 A.2d at 714 (internal quotation marks and citation omitted). To establish malice, a plaintiff must show that the government official "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Bord v. Baltimore County*, 104 A.3d 948, 964 (Md. App. 2014) (quoting *Town of Port Deposit v. Petetit*, 688 A.2d 54, 62 (Md. App. 1997)).

Nothing in the complaints even suggests that Mosby spoke at the press conference out of "hate" or "to deliberately and willfully injure" the Officers. *See id.* In discussing Mosby's MTCA-immunity defense to the state malicious-prosecution claims, the district court noted the same. *Nero*, 233 F. Supp. 3d at 486. The Officers do not seriously challenge that conclusion on appeal. Thus, the only question at this stage is whether Mosby was grossly negligent.

Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another," *Cooper v.*

31

*Rodriguez*, 118 A.3d 829, 845 (Md. 2015) (citation omitted)—"something *more* than simple negligence, and likely more akin to reckless conduct," *Barbre*, 935 A.2d at 717 (quoting *Taylor v. Harford Cty. Dep't of Soc. Servs.*, 862 A.2d 1026, 1035 (Md. 2004)). A government official commits gross negligence "only when he or she inflicts injury intentionally or is so utterly indifferent to the rights of others that he or she acts as if such rights did not exist." *Cooper*, 118 A.3d. at 846 (brackets and citation omitted). To get past Mosby's MTCA-immunity defense, the Officers must point to specific facts that raise an inference that Mosby's actions were improperly motivated. *Chinwuba I*, 790 A.2d at 115; *Barbre*, 935 A.2d at 717 ("[C]onclusory allegations of gross negligence [a]re not enough to bring the claim outside the immunity and non-liability provisions of the MTCA.").

The only statements that the Officers challenge as tortious are those Mosby read from the application for Statement of Charges. Specifically, the Officers allege that Mosby intentionally included false facts and omitted material facts in the application such that when she read it to the public at the press conference, she knowingly publicized inaccurate and defamatory information about them. Maryland courts have not directly addressed the necessary showing for gross negligence in the defamation or false-light context. But, given that gross negligence turns on "reckless disregard of the consequences" of one's actions, *see Cooper*, 118 A.3d at 845, we presume that Maryland courts would require a showing of reckless disregard for the truth or reckless disregard as to whether the omissions rendered the statements materially misleading.

This standard is a familiar one. It echoes the first prong of the *Franks* test, which provides that a criminal defendant cannot challenge a probable-cause affidavit, such as the

32

application for Statement of Charges, unless he shows that the affiant "knowingly and intentionally, or with reckless disregard for the truth," included "a false statement." *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). And it mirrors the necessary showing of "actual malice" in a defamation action brought by a police officer under *New York Times Co. v. Sullivan*—"that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *See* 376 U.S. 254, 279–80 (1964) (holding that public officials must show "actual malice" to recover for defamation); *Smith v. Danielczyk*, 928 A.2d 795, 805 (Md. 2007) ("[P]olice officers, from patrol officers to chiefs, are regarded for *New York Times* purposes as public officials."). Thus, in the absence of Maryland case law, we will look to cases applying *Franks* and *New York Times* for guidance as to how Maryland's gross-negligence standard applies to the publication of an allegedly misleading application for Statement of Charges.[8]

We have said that an allegedly false statement in a probable-cause affidavit amounts to "reckless disregard" if the drafter made the statement "with a high degree of awareness of [its] probable falsity." *Miller v. Prince George's County*, 475 F.3d 621, 627 (4th Cir. 2007) (citation omitted); *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991) (en banc) ("Reckless disregard has in turn been defined as publishing with a 'high degree of awareness of [a statement's] probable falsity.'" (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964))). In other words, "when viewing all the evidence, the

---

[8] The Officers in fact conceded at oral argument that if the application for Statement of Charges passes the *Franks* test, their defamation and false-light claims fail. *See* Oral Argument at 46:40–47:10.

[drafter] must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Miller*, 475 F.3d at 627 (citation omitted); *see also Reuber*, 925 F.2d at 711 ("[R]eckless disregard relates to a state of mind in which a 'defendant in fact entertained serious doubts as to the truth of his publication.'" (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968))). The Officers contend that three statements in the application for Statement of Charges were false: (1) Rice, Miller, and Nero arrested Gray without probable cause because the knife found on Gray "was not a switchblade knife and is lawful under Maryland law," J.A. 30; (2) Porter and White "observed Mr. Gray unresponsive on the floor of the wagon" but "[d]espite Mr. Gray's seriously deteriorating medical condition, no medical assistance was rendered or summoned," J.A. 31; and (3) "White who [was] responsible for investigating two citizen complaints pertaining to Mr. Gray's illegal arrest spoke to the back of Mr. Gray's head. When he did not respond, she did nothing further despite the fact that she was advised that he needed a medic. She made no effort to look or assess or determine his condition," J.A. 31. According to the Officers, the knife was in fact illegal, Porter and White "did not observe that Mr. Gray was in any distress," J.A. 179, and White called for medical assistance as soon as she learned Gray was unconscious.

But the Officers offer no facts to support their assertion that Mosby knew that any of her statements were false or seriously doubted their veracity. *See Miller*, 475 F.3d at 627; *Reuber*, 925 F.2d at 714. The Officers' mere disagreement with Mosby as to whether the knife found on Gray qualified as an illegal switchblade, or how to interpret the law, does not show that Mosby recklessly disregarded their rights. The lawfulness of the knife

34

is a legal question—not a discrete fact that can be proven true or false. And the existence of a counterfactual to Mosby's narrative does not give rise to an inference that she "had obvious reasons to doubt the accuracy of the information" she reported. *See Miller*, 475 F.3d at 627 (citation omitted). In fact, the Officers' narrative of the events of April 12, 2015, is so similar to that described in the application for Statement of Charges that it almost confirms the accuracy of the information Mosby reported.[9] While the Officers' version of events may have provided a defense to criminal liability, it is insufficient to establish that Mosby had a "high degree of awareness" that anything in the application for Statement of Charges was false. *See id.* (citation omitted); *Reuber*, 925 F.2d at 714 (citation omitted).

With regard to omissions in a probable-cause statement, we have said that a drafter acts with reckless disregard when she "fail[s] to inform the judicial officer of facts [she] knew would negate probable cause"—i.e., material facts. *Miller*, 475 F.3d at 627. Allegations of mere "negligence or innocent mistake" are insufficient. *Id.* at 627–28

---

[9] For example, the Porter-White complaint alleges that "Porter observed Freddie Gray lying on the floor of the vehicle . . . in a prone position, with his feet at the rear area of the transport compartment"; Porter heard Gray say "help" and "inquired if Mr. Gray wanted to see a medic and/or if he wanted medical help," to which Gray "indicated that he did want to have medical assistance"; Porter "advised Officer Goodson that he would need to transport Mr. Gray to the hospital," but Gray was instead taken to North Avenue where the van picked up a second arrestee. J.A. 172–73. The Porter-White complaint also states that White "received supervisor complaints"; observed "Mr. Gray sitting in-between the seat and the floor of the back of the police wagon, with his head down, leaning over"; "attempted to speak with him"; received no response; "heard him making noises" and "saw him breathing"; "concluded that his non-responsiveness was due to Mr. Gray continuing to be uncooperative and non-compliant"; and "got back into her patrol car and left the scene." J.A. 169.

(quoting *Franks*, 438 U.S. at 171). The Officers contend that Mosby omitted the following facts: (1) the second arrestee, who was placed in the police wagon with Gray, reported that Gray was conscious and banging his head against the wall "during much of the ride," J.A. 180; (2) another police officer reported that, at some point in time, he saw Gray in the back of the wagon in a "praying position" and not in medical distress, J.A. 180; and (3) the medics who treated Gray determined that his neck was "Normal" and treated him for possible drug ingestion or overdose, J.A. 180. According to the Officers, this information is material because it shows that they could not have known that Gray was in medical distress.

But these facts do not negate probable cause, let alone establish that the Officers had no knowledge of Gray's condition. Probable cause is "a probability or substantial chance of criminal activity, not an actual showing of such activity," and it is assessed based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230, 243 n.13 (1983). Here, Gray was conscious and healthy (or at least in good enough condition to run from the police) when he was arrested, and he was fatally injured and in a coma by the time he arrived at the police station. We therefore know that Gray was in medical distress at some time while in the Officers' custody. And the Officers agree that Gray in fact requested medical assistance at least twice.

With this background in mind, we do not see how the Officers' proffered facts preclude "a probability or substantial chance" the Officers knew Gray needed medical attention and failed to act. *See Gates*, 462 U.S. at 243 n.13. First, that Gray's co-passenger reported he was conscious and banging his head against the wall does not contradict the

application's assertion that Gray was in medical distress. Gray could have been banging his head *and* in medical distress. Second, a police officer's opinion that Gray was not in medical distress because he observed Gray in a "praying position" at some unspecified time during the wagon ride—a ride that spanned at least four stops—also does not show that Gray was not in distress. Third, that the medics treated Gray for the wrong medical problem is likewise of no moment. While it may show that the cause of Gray's medical distress was not immediately obvious, it does not show that the fact of Gray's medical distress was not obvious.

And, importantly, Mosby was "not required to include every piece of exculpatory information" in the application for Statement of Charges. *See Evans v. Chalmers*, 703 F.3d 636, 651 (4th Cir. 2012). Drafting a probable-cause statement involves advocacy—that is precisely why it falls under the umbrella of absolute immunity. *See Kalina*, 522 U.S. at 130; *see also supra* Part II. So long as the application includes all *material* facts, a prosecutor need not also present the defendant's defense. *See Evans*, 703 F.3d at 651. Here, because none of the omitted facts identified in the complaints is material, the Officers cannot show that Mosby acted with reckless disregard when she omitted them.

Accordingly, the Officers' allegations cannot support a finding of gross negligence. Although questions of gross negligence are typically for the factfinder to decide, *Barbre*, 935 A.2d at 717, we hold as a matter of law that nothing in the complaints gives rise to an inference that Mosby recklessly disregarded the consequences of her statements. *See E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 187 (4th Cir. 2018) (citing *Cooper*, 118 A.3d at 846); *see also Boyer v. State*, 594 A.2d 121, 132 (Md. 1991) (holding that plaintiff failed

37

to plead sufficient facts to show that officer acted with wanton or reckless disregard for public's safety).

V.

In conclusion, none of the Officers' claims can survive the motion-to-dismiss stage. That the Officers disagree with Mosby's decision to prosecute—as most defendants do—or with the information in the application for Statement of Charges—which inherently contains defamatory information—does not entitle them to litigate their disagreement in court, and much less recover damages.

The Officers' malicious-prosecution claims epitomize the "vexatious litigation" that absolute prosecutorial immunity is designed to preclude. *See Pachaly v. City of Lynchburg*, 897 F.2d 723, 727–28 (4th Cir. 1990). Having "transform[ed] [their] resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate," *see Imbler*, 424 U.S. at 425, the Officers ask us depart from well-settled law so that they can force Mosby to defend her decision to seek justice on behalf of Freddie Gray. We find their arguments both meritless and disconcerting.

The Officers' defamation and false-light claims are equally bereft of support. The Officers cite no facts showing that Mosby spoke at the press conference with malice or gross negligence, as required by the MTCA. Their allegations, accepted as true, do not even negate that Mosby had probable cause to charge them. And the Officers' contention that Mosby acted outside the scope of her employment by telling the public that she would pursue justice borders on absurd.

38

Perhaps to the Officers' chagrin, they must accept that they are subject to the same laws as every other defendant who has been prosecuted and acquitted. Those laws clearly bar the type of retaliatory suits that the Officers brought here. The district court therefore erred in allowing their claims to proceed.

*REVERSED*

WILKINSON, Circuit Judge, concurring:

I am pleased to join Chief Judge Gregory's fine opinion. It is an eloquent defense and application of neutral principles of law, no matter what the context.

I wish only to underscore my colleague's concern about the perils of appellees' defamation claim. State's Attorney Mosby is an elected official. After the death of Freddie Gray, her community, her constituents, and her city faced a crisis of confidence. Baltimore's citizens had their faith shaken, not only in the police, but in the very ability of government to administer justice. As any of us would expect of our political leaders, Mosby responded to a crisis. And as all of us should demand from our political leaders, Mosby explained her actions to the public. At a press conference, she read from a charging document, praised investigators, and explained the basis of the prosecution. To say that an elected official exposes herself to liability by discharging her democratic duty to justify the decisions she was elected to make is to elevate tort law above our most cherished constitutional ideals.

The First Amendment requires public officials, such as the police officers who brought this suit, to make a showing of "actual malice" in an action for defamation relating to their official duties. *See New York Times v. Sullivan*, 376 U.S. 254 (1964). That much is not in question. But powerful speech interests arise not only when public officials bring defamation actions, but when public officials are *subject* to them. Just as *Sullivan* recognized the sacred right of the citizen to criticize his government free from the threat of legal damages, the First Amendment also protects the public official's ability to explain his actions to his constituents. This free exchange between government and governed

40

legitimates and nourishes our democratic system. For the First Amendment was founded on the belief "that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

This is not to say that a prosecutor can never face consequences for reckless public remarks. But the proper avenue for regulating prosecutorial statements is a state's ethical code governing attorneys, not private tort suits. Under Maryland's Rules of Professional Conduct, for example, a prosecutor may face discipline if he makes "extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused," or "extrajudicial statements that have a substantial likelihood of prejudicing an adjudicatory proceeding." Maryland Attorneys' Rules of Professional Conduct, Rule 19-303.8. Notably exempt from that rule, however, are those "statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose." *Id*. Mosby's comments were of precisely that ilk. And for similar reasons, her comments were privileged under state law. *See Piscatelli v. Van Smith*, 35 A.3d 1140, 1152 (Md. 2012) (privileging "opinions or comments regarding matters of legitimate public interest" such as "the occurrence or prosecution of crimes"); *Smith v. Danielczyk*, 928 A.2d 795, 816 (Md. 2007) (privileging statements "required or permitted in the performance of [a public official's] official duties").

The defamation action here not only attempts to dilute the protections of *New York Times v. Sullivan*. It would weaken the defense of absolute prosecutorial immunity set forth by the Supreme Court in *Imbler v. Pachtman*, 424 U.S. 409 (1976). One of the dangers

41

against which *Imbler* warned was the use of hindsight, in this case the trial verdicts, to give rise to a § 1983 action or something akin to a state malicious prosecution claim. It is plain that the "the vigorous and fearless performance of the prosecutor's duty" would be eroded along with robust public discourse. *See Imbler*, 424 U.S. at 427.

By advancing a theory of tort liability for explanations of official acts, the officers here strike at the very heart of the democratic dialogue. Courts must repel such attacks. In doing so, we honor our "profound national commitment to the principle that debate on public issues should be unlimited, robust, and wide-open" on all sides. *Sullivan*, 376 U.S. at 270.

Defamation law unbound is inimical to free expression. I thought the principle of *New York Times v. Sullivan* secure. But no. As the saying goes, the censors never sleep. Here they come again.